SARAH M. DOUGLASS, Appellee, v. GEORGE DOUGLASS, Appellant.

1. **Divorce**: CRUEL AND INHUMAN TREATMENT. The address of base epithets, such as, a bitch, hellyon, a son of a bitch, by a husband to his wife, accompanied with such threats of physical violence ; as, shaking his fists in her face, and at times threatening to shoot her, and with occasional acts of violence toward the person of the wife, rendering her lame or bruised for some days, is such inhuman treatment as may be said, as a matter of law, to endanger the life of the wife, where the husband is a strong man physically, and possessed of an ungovernable temper, while the wife is not possessed of good health nor of much physical endurance ; although the organization and temperament of the wife is such that the use of the base epithets alone could not be held, as a matter of law, to endanger her life.

2. ———: CONDONATION. Cohabitation with the husband after the commencement of a suit by a wife for divorce, upon the ground of inhuman treatment, will not constitute a condonation of the offense on account of which the divorce is asked, where the inhuman treatment is continued during the time of such cohabitation.

3. ———: ALIMONY. The amount of the defendant's property was variously estimated to be from twelve to thirty-seven thousands of dollars above all indebtedness. *Held*, that an award to the plaintiff as alimony of four-sevenths of a piece of property valued at fifteen thousands of dollars, and the sum of two hundred and fifty dollars for attorney's fee, was not excessive.

*Appeal from the Woodbury District Court.*—HON. GEORGE W. WAKEFIELD, Judge.

WEDNESDAY, OCTOBER 22, 1890.

ACTION for divorce and alimony. There was a decree for the plaintiff, from which the defendant appeals.

*Lutz & Sears*, for appellant.

*Joy, Hudson, Call & Joy*, for appellee.

GRANGER, J.—I. The ground of plaintiff's action is cruel and inhuman treatment. The parties were married in 1872, and have resided at Sioux City for fourteen years before the commencement of this suit. The specific acts constituting the alleged cruel and inhuman treatment are, harsh and abusive language, threats and occasional acts of personal violence. We will not review the testimony at length, nor make extended comments. It abounds with efforts, as is so often true in this class of cases, in attempts to go into the forgiven past to unbury the little incidents that, because experienced and forgiven, should rather sweeten than mar the joys of domestic life, and to magnify their importance through or in the light of the later experiences leading to this attempt at separation.

1. DIVORCE: cruel and inhuman treatment.

An extract from plaintiff's testimony will best indicate the treatment which she claims is such as to endanger her life : " Within the last two years he is somewhat more like a madman than like a sane man at his home. He would come in the house and ask me what I had got to say. I wouldn't speak to him. He would ask me what I had got to say. Would tell him that I had nothing to say except his supper was ready, and that I was glad he had come home to supper, or breakfast, or dinner, or whatever it might be. He said he didn't care a damn about my feelings ; that I was lazy, and wasn't good for anything, and I wasn't worth hell-room anyway ; that I couldn't be depended upon ; that I was crazy ; and that he was going to have

me before the commissioners as a candidate for the insane asylum. He was most wild and abusive about a couple of times a week. His conduct, when not at his worst, was ugly and abusive. He would come in and swear at me because dinner wasn't on the table, or so a little thing wasn't done about the house, and he would continually swear and rave. Most of the time he had been drinking, I should say. He seemed to be very excited a great deal, most of the time on account of the stimulants he had taken, I suppose. He would commence abusing me, for instance, by asking what I had for supper, and then he would tell me that I didn't have anything for supper; and I would ask him to come in to breakfast, and he would say I didn't have anything for breakfast; and he would curse and swear because I didn't have anything for breakfast or dinner; and he would put on his hat sometimes and go to the office. When he did not go to the office, he would do a great deal of swearing and making his gestures with his fists at me. Oftentimes I would sit down to the table, and he would be in such a rage that he couldn't sit there to eat himself, nor wouldn't let me, and I would get up to go away, and he would set me down in the chair, and stand right over me, and if I would attempt to get up, as I did a great many times, he would stand with his fists right over me, and rave and swear at me. He pushed me into the chair by taking hold of my arms and shoulders, and seemed to be very violent; very much excited. He said he would fight hell out of me. There was no use for me to say anything. I told him I did not want to say anything. He put his fists against my face and head, sometimes twice a week, sometimes oftener. Every day in the week he curses and raves without me seeing any occasion at all. I only wanted him to be quiet, and try to quiet him, but he insisted on raving and raging. He laid hands on me several times,—many times. He would tell me that I couldn't handle him. Nobody could handle him. Mr. Joy could not handle him. He would fight hell out of Joy, and everybody else. I don't know what else he could do

but quarrel. He would call me a God-damn hellyon, and a God-damn bitch, and said I was a fighter. He called me a son of bitch, and everything of that sort. One Sunday he came home to dinner about four o'clock in the afternoon. I was sitting in the room reading, and he wanted to know what I had got to say because he did not come to dinner. I said, 'Nothing, but your dinner is ready there on the table.' He said I had no dinner for him, took hold of me, and as I was leaving the sitting-room he followed me into the little hall, pushed me down on the stairs, and kept me there for a long time,—about three-quarters of an hour,—raging and raving over me, calling me names, saying that I could not fight him, and that Joy could not fight him ; that he would do what he pleased, come home when he pleased, and go where he pleased. He put his hands against me, straightening me out on the stairs, leaving no marks, but I was lame for a week. He took once hold of me by my shoulders with his two fists up against me, from which I carried the marks for two weeks, without a reason,—just because he was ugly. He often said he would send me to hell. A year ago last summer he took hold of my shoulders, and jammed me right up against the side of the house. I had black and blue marks for a couple of weeks. It left me prostrated so that I was very nervous and weak. One day, while I was arranging the table, he came up and around to me, shook his fist in my face, and said he would fight hell out of me. I told him to be quiet. I started to go in the other room. He took hold of me and throwed me on the bed. I had a dinner knife in my hand, and dropped it, and when he insisted on throwing me as he did, I said : 'I will strike you with the knife if you don't leave me alone ;' and in defense I just drew the blood on his hand a very little. He threatened to knock hell out of me if I did not settle down and be a woman. He wanted me to settle down and be a woman. He kept me about an hour on the bed, setting me down every time I would raise. He injured my side by doing so, and broke a slat in the bed. I was lame for three

weeks in the spine and neck, and entirely prostrated. His conduct during nights was cross. He would swear and rave, sometimes two hours. He would ask me if I was asleep, why I did not sit up, why I wasn't awake, or why I wasn't asleep. I used to sit up for him, and he would swear on that account, and said he should stay out nights as long as he pleased, and threatened to knock me into hell if I didn't go to bed and sleep. I used to go out of the house to sleep. He came home so enraged, so crazy, that I was afraid to stay."

It is not, as we understand, and could not well be claimed, but that if the plaintiff's statements, as set out, are true, the treatment of her is so inhuman as to endanger life. With a few exceptions, the statements of the plaintiff as to the conduct of the defendant are expressly denied by him in evidence, and in many instances there is no corroborative evidence for either party. It is true that, for some years past, the domestic life of the parties has been so quarrelsome that, if the sunshine of peace has dawned upon it, the fact has not found its way into the record of this case. A reason for this may be that the zeal for success in the trial has led each party to trace out, and bring to light in the record the faults rather than the virtues of the other. From our examination of the record, we are led to the belief that neither party is alone responsible for this unhappy condition of affairs. Our inquiry is, whether the continuance of the relationship of the parties will endanger her life because of inhuman treatment by the defendant. Any husband who says to his wife, without provocation, as is apparent from the record of this case, that she is "a bitch, a hellyon, a son of a bitch," and names of that sort, is guilty of inhuman treatment. The law in providing for a divorce for inhuman treatment contemplates that human beings may be guilty of inhuman conduct ; and such expressions are certainly "cruel and unfeeling," and "destitute of that kindness and tenderness that belong to a human being." Such treatment, however, does not always endanger human life. Much depends upon the organization, the temperament,

of the person subjected to the treatment. Many a wife and mother of refined sensibility, and of a non-combative temperament, thus victimized, would languish and die. Others, less refined, or more combative in temperament, would meet the emergency without danger to life, or even an impairment of health.

If this record stood alone upon the danger to the life of plaintiff, because of the treatment by the defendant in applying to her base epithets, or, added thereto, her complaints as to his general demeanor, including her charge of neglect, we should hold that the conduct was not such as to endanger life. To us the important inquiry is as to his threats and acts of personal violence. Her testimony shows that he has repeatedly assaulted her. This he denies. One assault was surely made when she had a table knife in her hand, but each says the assault was made by the other. As an aid to the truthfulness of these statements, we may look to other incidents in which there is corroboration. We do not find that the defendant, in terms, admits or denies that he made threats of personal violence. It is, perhaps, a fair inference, from his testimony, that he denies them. If admitted, it would go far to substantiate plaintiff's statements as to the violence. If he intends a denial, we think his statement is fairly overcome by the record. It is somewhat significant that, in nearly every instance where their quarrels have been witnessed, her statements have corroboration. The defendant says that in every instance of their quarreling, except one, she commenced it. The girl who worked for them six weeks two years before the trial, and four weeks one year before, in her testimony, leaves little room to doubt that the defendant's statements are not true. During the first period, the defendant was certainly very abusive in language, and quarrelsome, and without any provocation, and she says the second time she was there he was just as bad, if not worse. She says it was an every-day occurrence—sometimes three times a day—" that he swore and cursed; that plaintiff would, to make peace, leave the house until he went

back to the office, and later let him jaw until he got tired." This is a plain contradiction of the testimony of the defendant, and corroborative of the plaintiff, and is of value in settling the questions of conflict in other particulars.

Nellie Walker, a sister of plaintiff, was in the family frequently for the last two years, and testifies that the doctor called his wife bad names, and used profane language almost every day, and says: "Several times, at the dinner table, he got up and stood over her, and cursed her, and said he would send her to hell." She says: "I have seen him pull her round, but I never saw him strike her." This is again corroborative of the plaintiff, and plainly contradicts the defendant.

Mr. Joy, the senior counsel for plaintiff, before the commencement of this suit, was at the house in her interest to procure a settlement of their property affairs, and says: "The doctor spoke to me when he came into the room a few words. Then he went across to Mrs. Douglass, and commenced: 'You damned hellyon, what do you want? Damn you, you are naught.' He shook his fists in her face, and called her a damned hellyon. 'I will send you to hell. I will fix you, damned bitch,' and epithets of that kind." The defendant, in his testimony, admits that he commenced this quarrel, and admits much of the testimony of Mr. Joy; but says he did not call her a bitch, or shake his fists in her face. He says when he quarrels he is in the habit of making gestures with his fists. The difference between gestures with the fists and the shaking of fists, when one is standing over another with such threats, might be difficult to know. We do not, in this connection, lose sight of the provocation that plaintiff was then contemplating this suit, and was seeking to divide the property they possessed, which was of considerable amount, and against the wish of defendant; but the fact is of considerable value in this, that it shows the inclination of the defendant, when under provocation, as to threats and violence, and his conduct on this occasion is in accord

with the testimony of the plaintiff, and some other wit-
nesses, as to his general conduct towards her when in
anger, and goes far to support the statements of the
plaintiff as to repeated assaults upon her.    Both the
defendant and Mr. Joy say that at this time the plain-
tiff was mild ; and Mr. Joy says she tried to induce him
to be quiet, and that she finally began to cry.    The ser-
vant girl, whose testimony we have cited, says the
plaintiff would say, when defendant was talking :
"Doctor, please be still ; please be still ; don't talk so."
And she says:   "I can swear I never heard her swear
or quarrel."

It is very clearly shown by the evidence that the
plaintiff repeatedly fled from the house to the neighbors
after the defendant returned home at night ; sometimes
remaining over night, and at others returning home for
the night.    The defendant does not deny the facts as to
her going, and could not, well, for she is abundantly
corroborated by the neighbors ; but he denies that his
conduct was the cause of it, and claims that it was done
for effect.    The plaintiff says the doctor often threat-
ened to shoot her, and that he kept a revolver part of
the time, which she took from under his pillow, and
put in the drawer.    We do not understand the plain-
tiff to mean that the revolver was kept with a view
of violence towards her, but only that he had one for
protection, and, when in anger, would make such
threats ; and we attach no other importance to this par-
ticular fact.

Our conclusion is that the plaintiff is sustained by
the evidence in her statements, as to acts of personal
violence by the defendant ; and, with that fact found,
but one result can follow.    The acts of violence are not
the results of any deliberative purpose, but of an
ungovernable temper, rendered more dangerous in later
years by the excessive use of ardent spirits.    The
defendant is a strong man physically, and the plaintiff
by no means of good health, or much physical endur-
ance.    It is not for a court to say, in view of such
habitual treatment, certainly inhuman, with a man of

such a temper and physical force, and the added uncertainty of what his drinking habit and growing dislike may induce, that the life of the plaintiff is not in danger. If we concede that the plaintiff is meddlesome in her ways, and has done much that would naturally promote domestic discord, there is nothing in her course of conduct that is a justification of the defendant's treatment, or that can furnish him a legal excuse as against her claim for separation.

II. There is a claim of condonation because of cohabitation after commencement of this suit. The

2. —: condo-nation. claim has no support in the record because of the after conduct of defendant. And, again, admitting the application of the rule to acts of cruelty, it is of very doubtful merit in such cases, unless the court is satisfied that the danger which is the basis for the separation no longer exists. From the very nature of the case, the doctrine should be applied with caution, where the object of the decree is safety to life. 2 Bish. Mar. & Div., secs. 51 and 58.

III. The plaintiff was possessed of property in her own right. There is a conflict of testimony as to the

3. —: alimony. amount of the defendant's property. The plaintiff urges that it is over thirty-seven thousand dollars, and the defendant about twelve thousand dollars, besides indebtedness. It is quite likely the true amount is somewhere between the estimates of the parties; but certainly that of the defendant must be too low. Lot 12 in block 11, east addition to Sioux City, belonged to defendant, and the district court gave to the plaintiff four-sevenths thereof, with two hundred and fifty dollars as attorney's fees. The value of the entire lot is about fifteen thousand dollars. Defendant insists that the allowance is too much. The parties have one son, about sixteen years of age, as to whom the district court made no orders; but reserved the right to do so hereafter, on the application of either party. In view of all the facts, we are not prepared to say the allowance of the district court is not right. It is

not a matter on which different persons, by separate calculations, would be likely to reach the same conclusion as to amount.   The judgment of the district court is AFFIRMED. '