FRANK SIEFKER, Appellee, v. CLARA SIEFKER, Appellant.

DIVORCE: Grounds—Adultery—Evidence. Evidence held insufficient
1  to establish adultery on the part of a wife.

DIVORCE: Grounds—Inhuman Treatment. Evidence reviewed, of acts
2  of physical violence toward a wife, threats, unfounded accusations
of adultery, and coercion of wife into submitting to an operation
to remove sterility at a time when the husband had determined to
desert her, and held to justify a decree of divorce.

*Appeal from Osceola District Court.*—C. C. BRADLEY, Judge.

OCTOBER 24, 1924.

ACTION for divorce, with a cross-petition asking like relief. From a decree for plaintiff, defendant appeals. Reversed, with

direction to enter a decree for defendant on the cross-petition.—
*Reversed and remanded.*

*Fisher & Riter,* for appellant.

*Riniker & Thomas,* for appellee.

VERMILION, J.—The parties were married in 1914, and for some time before their separation lived in Ashton, a town of about 600. At the time of the trial, the plaintiff, the husband, was 41, and the defendant 32 years of age. They have no children. The plaintiff is of German birth, and the defendant of German parentage. He appears to be an industrious and somewhat enterprising man. He owned and personally operated an electric lighting plant at Ashton. So far as can be determined from the transcript of his testimony, he appears to be fairly well educated and intelligent; but his testimony exhibits a mental bent and credulity that we find difficult to understand. The defendant, judging by the record of her testimony, appears to be dull of comprehension and understanding. There is much to indicate that she was suffering from some mental weakness or deficiency. Great difficulty seems to have been experienced in making her understand comparatively simple questions and in securing intelligent answers. Her answers were largely confined to "yes" or "no," and at that, were frequently not responsive. How much of the apparent peculiarity in the testimony of both of them arose from lack of understanding of idiomatic English, or from attempts to express themselves in that language, it is impossible to say, from the printed record.

1. DIVORCE: grounds: adultery: evidence.

The petition charges defendant with adultery with five men, whose names are given. The only evidence to support the charge is testimony of admissions on the part of the defendant. Earnest, an unmarried brother of plaintiff's, who lived with them for a time, figures largely. He is not named as a corespondent, although the plaintiff seems to have suspected him of undue familiarity with his wife. He is the only man concerning whom there is the slightest evidence, aside from the defend-

ant's admissions, tending to create even a suspicion of improper relations with her. The husband testified to seeing his wife coming from the brother's room one morning. Her explanation was that the latter had asked her to bring him some socks. He testified that on another occasion he returned unexpectedly to the kitchen, to find his wife with an egg in her hand, and that, two or three months later, he found an egg in his brother's room. That this should be mentioned by him as a suspicious circumstance is indicative of his mental attitude. He also testified that his brother, when drunk on one occasion, offered to fight him about the defendant, saying: ''You don't want her.'' The brother was not a witness. There is no claim that the defendant ever admitted improper conduct with him, and she denied it as a witness. The brother's conduct indicates that he was trying to cause trouble between the husband and wife, and to bring about a separation. But, passing the fact that adultery with him is not alleged, there is no sufficient evidence to show that the wife was a party to any such effort or plan, much less that she was guilty of adultery with him.

Turning now to the charge of adultery with the five men named as corespondents, we repeat that the only evidence to support it must be found in the alleged admissions of the defendant. The plaintiff's suspicions in connection with any of these parties were first aroused about Easter, 1922, by a conversation between himself and another brother, Fred. Concerning this, plaintiff testified:

''My brother Fred asked me, 'What do you think of John Karpen?' and I said, 'He is a good friend.' John Karpen is a young man I should judge around thirty years of age, at that time being a barber at Ashton. That evening I had a conversation with my wife in the bedroom, when we were alone. I spoke to my wife, and asked her, I says, 'Clara, is it true what brother Fred and brother Earnest say, that you have sexual relations with John Karpen?' She answered, 'Yes, Frank.' My answer was, 'Clara, how could you do that?' and she couldn't answer.''

It appears that Earnest was sent to Rock Rapids, to inform defendant's father of this. The father came to Ashton; and in relation to what then occurred, plaintiff testified:

"Then we came into the kitchen. My wife was standing there. I didn't hear any words, but I could see it,—a kind of motion my father-in-law made. He asked whether the charge was true, and I saw my wife saying 'Yes.' Q. Did you hear her say 'Yes?' A. Faintly, very faintly. Nodded her head, and my father-in-law turned around, as if to say, 'That is too bad.' "

As to this, the defendant's father testified:

"I asked her if it was true, what they said was going on there, and Clara made no answer, but shook her head, and said 'No;' but at this time she never spoke a word."

Shortly after this, plaintiff consulted a minister about the matter, who came to the house and talked with the wife in the presence of the husband. He and the plaintiff testified that, in response to his question whether she admitted having committed adultery, she said "Yes." Some time later, an attorney representing Karpen called upon plaintiff concerning statements he had made about the alleged relations between Karpen and his wife. Thereupon, plaintiff, seemingly fearing a suit for slander, took his wife to another attorney at Sheldon, who testified that, in the presence of the plaintiff, she admitted having had sexual intercourse with Karpen.

The plaintiff testified that his brother said to him, after the visit to the attorney at Sheldon:

"Frank, you don't know everything that has been going on; there is more men implicated in this; there is H. S. King, C. J. Kessler, and Frank Ovel and Herman Schroeder, too."

Plaintiff further testified that he talked to his wife about these men in June sometime. He said:

"I asked her if Dr. Kessler and John Karpen had come in company, and she told me 'Yes;' and I asked her how did they come into the house. She didn't know. I asked my wife, I said: 'How can they get into the house?' She didn't know. I said: 'Did they use chloroform to dope me?' and she said: 'Yes, they doped us both, and then they would carry me from the bed out in the den.' I said: 'Clara, I can't understand that.' At first she told me that they chloroformed us both, and a few nights later, she said, 'They chloroformed you;' and I said, 'What did they have?' and she said they had something like what they

have in a hospital, and bandages. They would pour something onto that and then put it on my nose; and then I asked who did that, and she didn't give me any answer, and she says, 'In doing that you wanted to do it quick.' After they chloroformed me, my wife would have intercourse with one of them while one man was standing in the closet, and through a mirror on the dresser he could see me lying in bed; they could see me plainly in bed. I said, 'They watched me;' and she said, 'Yes, they watched you all the time.' "

On cross-examination, he testified that his wife told him they chloroformed him every other night. Plaintiff further testified that he remembered he had seen an early light in Herman Schroeder's place when he would go to work, and said:

"I asked my wife, 'Did Herman Schroeder come up in the morning when I left the house?' and she said: 'Yes, he would come up then.' I also asked whether Herman Schroeder had been there on Christmas morning. The reason I asked for Christmas morning was that it seems like on Christmas morning my wife never got up. I would come in at half past eight, and breakfast was not ready,—and she told me Herman Schroeder had been there on Christmas morning. I questioned her after my brother had mentioned Schroeder."

On being asked how his wife explained it, he said:

"Why, he would come into the house,—she didn't tell me, nor did I ask how he got into the house,—but he would come up early in the morning and have sexual intercourse with her."

As to King, plaintiff testified that he refused to talk to King on one occasion, and ordered him away from the light plant because he knew he was guilty. He said:

"I had asked my wife, I says, 'Clara, if he wasn't with you, you better say so;' and she says 'Yes.' I asked her how many times, and she says, 'Twice.' "

Concerning Ovel he testified:

"It was in the year 1918, when Frank Ovel asked me to retire to the engine room. At noon he came over to our house and brought some fruit down, and I asked my wife whether Mr. Ovel came back since then, and she said, 'Yes,' he came back that

night, and brought some fruit, and he came back other nights and had sexual intercourse with her.''

Fred Siefker testified to a conversation in the presence of the brother Earnest, as follows:

''I said: 'Clara, what is the trouble at Ashton,—is what Earnest tells me about you true?' and she said, 'Yes.' I said, 'Who is them fellows?' and she said, 'John Karpen, Henry King, and Dr. Kessler;' and I said, 'You ought to be ashamed to do anything like that;' and she commenced to cry. She said her relations occurred back of the fruit store and in Mr. King's store.''

He also testified to the admission in the attorney's office at Sheldon. Anna Siefker, Fred's wife, testified:

''She [defendant] was at our house on Sunday, April 23, and I couldn't believe it; so I asked her. Frank was there at our place, and when I asked her, she told me 'Yes.' She said it was the barber,—I think it was Karpen. When I asked her if they were coming to the house yet, and she said 'No,' they had not been coming for more than a month. She said they were getting too dirty. And when Clara and Frank came to our house and Frank asked if Fred could come with them to Sheldon,—they had had some trouble that could not go on,— and then she was right there, and Frank said, 'Isn't that so, Clara;' and she said 'Yes.' Frank said there was a fellow always around after Clara, and they had some trouble; and Clara said 'Yes.' ''

We have set out this testimony at some length because of the manifest improbability and absurdity of much of it. It shows that plaintiff's suspicions of improper relations with any of the corespondents were first aroused, and his accusations made, as the result of a remark void even of innuendo against his wife. Many of the things said to have been admitted by her were first suggested to her by plaintiff, and, so far as the testimony shows, aside from the admissions, had not only no foundation in fact, but evidently must have originated in his own jealous imagination. The incredible story of the chloroforming of plaintiff every other night was first suggested by him without any basis whatever, so far as the testimony shows,

in anything he had heard. Her alleged ready assent to it, and her claimed elaboration of details, some of them to be accounted for, probably,—whether originating with her or her husband,—by her previous experience in undergoing an operation in a hospital, stamp his whole story of her admissions as unreliable as proof of adultery. The defendant denied making any admission of guilt, and explained her failure to assert her innocence, when accused before others, by saying that she was afraid of her husband. In that connection, she testified to some previous acts of violence on his part, not of a very serious nature, but indicative of an overbearing disposition; and that he had twice threatened to kill her. All of the admissions testified to by other witnesses, save in one instance, were made in the presence of her husband. We do not say that she did not on several occasions admit that she had committed adultery; but, conceding that the admissions were made as claimed, the very improbability of some of them and the circumstances under which they were made materially affect their probative force to establish the fact of adultery.

The defendant as a witness denied any improper relations with any of the parties named. All of the corespondents were examined as witnesses for the defendant. Each of them denied in positive terms any improper relations with her. Karpen testified to a speaking acquaintance with her for a year or two, and to driving her and her husband to the country on one occasion, and denied that he had even been in their house. Dr. Kessler, a dentist, testified to treating defendant professionally in his office three or four times, and that that was the extent of his acquaintance with her. He denied ever being in her house, and denied that he was there with Karpen and "doped" her husband. King, a merchant, testified to being at Siefker's once for dinner, with three other service men, and to visiting there once with his wife; and that plaintiff and defendant had visited at his home; and that defendant had been in his store, usually with her husband. Ovel, engaged in operating a grain elevator, testified that he had merely a speaking acquaintance with defendant, and denied he had ever been in her house or taken fruit there. Schroeder testified to being at the house twice:

once for dinner, at the invitation of plaintiff, and once when he went there with the plaintiff.

There is not a word of testimony, aside from defendant's admissions, tending to show an adulterous disposition on the part of the defendant or any of the corespondents; and nothing to show that they are not men of good character. She is not otherwise shown to have been in the company of any of them, save on the occasions they themselves mention. Her reputation is shown to have been good. Close neighbors testified that her conduct was seemly, and that men were not seen going to the house.

There is another important circumstance that is extremely difficult to reconcile with plaintiff's story. In 1920, the defendant, at plaintiff's request, had submitted to an operation, the purpose of which was to enable her to bear children. The operation was performed at a hospital, and she remained there some two weeks. On June 28, 1922, after all of the admissions testified to by plaintiff had been made, he again took her to a hospital, and she submitted to another operation for the same purpose. About this, plaintiff testified:

"She did not want to have it done yet. Then after Easter day she permitted me to have it done. * * *

"Q. You brought her up here to the hospital to have that operation performed so she could bear children for you, didn't you? A. Yes."

On July 19th, following the second operation, plaintiff took defendant to her parents' home at Rock Rapids, where she has since remained. Plaintiff testified that at that time:

"She wasn't in poor health; she was convalescing,—getting better. She wasn't healthy; she was quite poorly. I can't say they led her into the house. They both walked."

Both of the parents testified that she was very weak, and the mother helped her into the house. The plaintiff had promised to come and get her when he had a new home, or a new place. He did not do so, and brought this action. He testified:

"I made up my mind I would not live with her after Ovel, King, Schroeder, and Kessler had had improper relations with

her. That is when I made up my mind we wouldn't live together any longer.''

We are clear that, upon the whole record, the adultery charged has not been established by a preponderance of the evidence.

By cross-petition, the defendant asks a divorce on the ground of cruel and inhuman treatment such as to endanger her life.

The acts of physical violence committed by plaintiff, so far as they are described in any detail by defendant, would not alone warrant a divorce; but when considered in connection with the testimony as to his threats, his accusa-

2. DIVORCE: grounds: in- human treatment.

tions against her, and his conduct in procuring her to submit to the second operation to remove sterility after he had determined to live with her no longer, we think her right to relief is established.

The defendant holds title to an undivided half interest in the home, worth, over and above a mortgage, $3,200. Plaintiff has, in addition, $900, the proceeds of a sale of the lighting plant. We see no occasion to disturb this arrangement.

The decree below will be reversed, and the cause remanded, with direction for a decree for defendant on the cross-petition.— *Reversed and remanded.*

ARTHUR, C. J., and STEVENS and DE GRAFF, JJ., concur.