HELENA SCHNECKLOTH, Appellee, v. PETER J. SCHNECKLOTH, Appellant.

No. 39787.

DECEMBER 13, 1929.

*Chamberlin & Chamberlin,* for appellant.

*J. C. France,* for appellee.

KINDIG, J.—Helena Schneckloth, the plaintiff-appellee, relies upon inhuman treatment as the ground for obtaining a divorce from her husband, Peter J. Schneckloth, the defendant- appellant. Upon that basis the decree was entered by the district court. A reversal is asked by the appellant because: First, appellee's evidence does not show inhuman treatment; second, assuming that it does, there was condonation; and, third, the alimony is excessive. These complaints will now be considered in the order named.

I. Section 10475 of the 1927 Code provides:

"Divorces from the bonds of matrimony may be decreed against the husband for the following causes: * * *

"5. When he is guilty of such inhuman treatment as to endanger the life of his wife."

Two requirements are made by that legislation: First, the husband's conduct must be inhuman, and, second, it must endanger the wife's life. *Blair v. Blair,* 106 Iowa 269; *White v. White,* 200 Iowa 779; *Hill v. Hill,* 201 Iowa 864. Such prerequisites are not met by proving mere incompatibility. *Olson v. Olson,* 130 Iowa 353; *Meyer v. Meyer,* 169 Iowa 204; *Smith v. Smith,* 179 Iowa 723. On the other hand, "life may be endangered by treatment though it involves no physical violence." *Thompson v. Thompson,* 186 Iowa 1066; *Cruse v. Cruse,* 201 Iowa 810; *Shors v. Shors,* 133 Iowa 22; *Berry v. Berry,* 115 Iowa 543; *Coulter v. Coulter,* 204 Iowa 575. Each case must be decided upon its own facts, for no two cases are exactly alike. *White v. White* (200 Iowa 779), supra.

Hence, it is necessary to review the facts in this case for the purpose of determining whether the district court properly en-

tered the decree. Appellee and appellant were married February 21, 1906, and lived, during their married life, on a farm one and one-half miles from Bennett. As a result of this marriage, there were born to this couple five children, Clara, Elmer, Raymond, Florence, and Clarence. Their ages are, respectively, 21, 20, 18, 16, and 13. All the children lived at home except Raymond, who left the paternal abode in October, 1927. From the time of the marriage, in 1906, appellee lived with appellant until June 10, 1928, when she, together with the four remaining children, went away from the premises. Appellant's health was not always good. At times he was troubled with rheumatism. He was industrious and economical, but apparently rather overbearing and eccentric. Evidently he did not believe in the American school system, and denied his children the right to attend school further than the eighth grade. Furthermore, appellant discouraged attendance at church and society functions. Consequently, the family lived very much at home, and did not enjoy the general activities of the community.

It appears that appellant had no sympathy for appellee, and treated her as a mere servant and mistress. Throughout the later years of their married life, appellant constantly cursed and reviled appellee. Repeatedly he referred to her as a "sow." This he did in the presence of his children. Moreover, appellant struck and beat appellee, and caused black and blue spots on her body. Continuing his abuse, appellant, upon one occasion, and possibly two, drew a gun on appellee, and threatened her life. One cold, rainy night, appellant's conduct drove appellee and two of the children from the house. They stayed in outbuildings part of the time, and then went to a schoolhouse, where they remained until morning. When one of the boys asked concerning his mother and sisters, the next morning, the appellant threatened the inquirer with violence, but was prevented from carrying out his threats. No reason appears for appellant's actions in this regard. When appellee wept because of her father's death, appellant became angry, and struck her.

Sometime in 1926, appellee had serious rectum trouble, and went to Excelsior Springs for treatment. That care cost appellant $400, and he cursed and scolded appellee because thereof. Many times, appellant told appellee "to get out." Locks were removed by appellant from appellee's bedroom doors, in order

that she could not have privacy. Another serious mistreatment which appellant inflicted upon appellee was his constant accusation that she was unfaithful to him, and that he was not the father of the above-named children. Those statements were made by appellant in the presence of his children.

Replying to such suggestions, appellee attempted to show the falseness thereof, but appellant ignored her explanations. Obviously, the record discloses that there was no reason for appellant's suspicions. For instance, he would ask a neighbor to take his wife to town, and, upon their return, would complain because of improper conduct. Generally the children or some other third person accompanied appellee upon such journeys. During the trial, appellant testified that there was no basis for thinking he is not the father of the children, yet he says there is a lingering suspicion about the matter, because someone had suggested it. Why this is so, the record does not disclose. Do these facts justify the trial court in granting the divorce?

Attempt has not been made to set out all the facts and circumstances, but rather, it has been our purpose to present a general outline. Accusations of unchastity repeatedly made by a husband against his wife, without foundation, may amount to inhuman treatment. *Miller v. Miller,* 203 Iowa 1218; *Butts v. Butts,* 185 Iowa 954; *Siefker v. Siefker,* 198 Iowa 887; *Massie v. Massie,* 202 Iowa 1311; *Coulter v. Coulter* (204 Iowa 575), supra. Especially is this true when, in addition to the false accusations, there is personal violence, cursing, and other abuses, as shown by the foregoing recital. Denial is made by appellant concerning some of his alleged actions, although partial admissions are made by him. Other times, he answered the charge by saying that he did not remember, etc. The children testified for and corroborated appellee, while appellant alone gave evidence for the defense. What was stated in *Casey v. Casey,* 116 Iowa 655, may with propriety be said concerning the case at bar. During the discussion in *Casey v. Casey,* we declared:

"It is always a sad thing to see children arrayed as witnesses against a parent, and in this case it is doubly so, because of the bitterness and hatred appearing in the testimony of the children. There must, however, be some reason for this intense feeling against the father. The children have all reached an age

which enables them to know and understand the nature of the acts and conduct of. the parties towards each other, and it is hardly possible that they could be so lacking in filial love and respect for a good and kind father as to fabricate the damaging testimony given by all of them. against him. It is not an unusual circumstance to find children divided in their support of parents in these unhappy affairs, but it is rare indeed that we find them all arrayed without cause on the side of one parent.''

Under the circumstances here presented, we are constrained to hold that appellant's conduct was inhuman.

II. Also, the other statutory requirement was met, for appellee's life was endangered. Her nerves ''just snapped,'' and her mind at times failed her. Likewise, appellee apparently was not safe, living with her husband. Upon at least one occasion, this grief-stricken woman threatened to burn the house and commit suicide, in order to get away from the strain of appellant's treatment. When at Excelsior Springs, appellee was told that her nervous condition was due to her domestic grief.

Then, in addition to the foregoing, appellant actually seriously threatened appellee with a gun. Resultantly, her life was endangered. Therefore, the district court was justified in granting the divorce, unless there was condonation.

III. Assuming, without conceding, that the foregoing is true, appellant further maintains that appellee is not entitled to a divorce because of condonation. This alleged condonation is predicated upon the fact that the appellant and appellee at all times cohabited as man and wife.

Basis for condonation, however, does not exist in the case at bar. At no time did the inhuman treatment cease. While it may be true that in the latter months appellant did not strike  appellee, yet he persisted in calling her names and making false accusations of infidelity against her. So, too, he continued other ill treatment of her. Complete domination was exercised over appellee by appellant. She feared him. Wherefore; there was no condonation. *Douglass v. Douglass,* 81 Iowa 258; *Craig v. Craig,* 129 Iowa 192; *Davison v. Davison,* 182 Iowa 1116; *Hickman v. Hickman,* 188 Iowa 697; *Massie v. Massie* (202 Iowa 1311), supra; *Coulter v. Coulter* (204

Iowa 575), supra. Concerning this subject, we said, in *Hickman v. Hickman*, supra:

"The defendant pleads condonation. This plea is predicated upon the alleged fact that the parties cohabited after the alleged cruelty. But cohabitation is not necessarily a condonation of cruel treatment, and this is especially so as to the wife. As the weaker vessel, and as the victim of such cruel treatment, she is often to be deemed as under some degree of duress. Her moral freedom of action is to be considered on a plea of her condonation. Condonation, if proved, implies the condition that kindness shall supplant the cruelty complained of. Subsequent conjugal unkindness will avoid condonation, even though such unkindness be less than extreme cruelty, and be insufficient of itself as a ground of divorce. * * *"

IV. Further complaint is made because the alimony allowed is excessive. As before stated, the district court, after granting appellee a divorce, gave her the custody of the minor  children. An allowance of alimony was made by that tribunal to the following effect: $8,500 and certain specific articles of furniture. $400 as fees for appellee's attorneys, in addition to the court costs, were also taxed against the appellant.

Appellee is approximately 50 years of age, while the appellant is about 60 years old. His estate approximates $21,000, consisting of an 80-acre farm, $3,000 worth of personal property, $1,200 cash in the bank, and 6 shares of bank stock, on which a 6 per cent dividend is regularly paid. There are no debts. To this property appellee contributed $300 in cash, about 22 years ago. In addition to that, she sometimes assisted her husband in the farm work, by doing chores and helping with the planting and harvesting of crops. Throughout her married life she did the housework, took care of the children, and cared for a garden. It appears that appellee has no property of her own with which to support herself and the minor children. The net proceeds accruing to appellant from the farm for the year 1927 were $517, after paying all expenses. Possibly those expenses included the $400 doctor bill at Excelsior Springs. Ordinarily, then, the net income would be more than $517.

Manifestly, appellee will need the $8,500 to support herself and children. That alone, however, is not sufficient to warrant the court in fixing the amount. *Fitch v. Fitch,* 207 Iowa 1193; *Evans v. Evans,* 159 Iowa 338; *Nelson v. Nelson,* 193 Iowa 463; *Black v. Black,* 200 Iowa 1016; *Schorr v. Schorr,* 206 Iowa 334. We said in *Fitch v. Fitch,* supra:

"Numerous elements enter into the problem of fixing alimony. The wife's necessities are not alone the criterion, because the husband's ability to pay, as well as other contingencies, must enter into the equation."

Again, it is said in *Black v. Black,* supra:

"The court does and should take into consideration the sex, age, health, and future prospects of the parties, the private estate of each, the contributions of each to the joint or accumulated property, the children involved and to be provided for, the earning capacity of each, their respective incomes, and their respective indebtedness. These and other facts pertaining to the case are sufficient to enable a court to arrive at a just, fair, and equitable decision in the matter."

Presented in the case at bar is a record which reveals the cruel conduct on appellant's part, without retaliation by appellee. Her health is not good, and yet she must support the minor children. For practically 23 years appellee worked for appellant, and helped him accumulate the $21,000. Why, under the circumstances here presented, should she and the children be left without sufficient of that property to live on? Appellant possesses enough property to afford the alimony allotted. See *Douglass v. Douglass* (81 Iowa 258), supra; *Vey v. Vey,* 150 Iowa 166; *Martin v. Martin,* 150 Iowa 223. Undoubtedly, part of this sum can be paid by appellant from his personal property and cash aforesaid. If he does not desire to sell the land, the remainder of the alimony may be raised through a real estate loan. Apparently the farm is well improved.

Notwithstanding the foregoing, appellant still maintains that appellee was given too much of the property. Reliance is made by him at this juncture upon the following authorities: *Blain v. Blain,* 200 Iowa 910; *Mitchell v. Mitchell,* 193 Iowa 153; *Evans v. Evans,* 159 Iowa 338; *Davison v. Davison* (182 Iowa

1116), supra. Distinction, however, appears between the facts in the cited cases and those presented in the case at bar.

After giving careful consideration to the entire matter, we are inclined to the opinion that the district court was right. Accordingly, the judgment and decree of that court is affirmed.— *Affirmed.*

ALBERT, C. J., and EVANS, FAVILLE, and GRIMM, JJ., concur.