LOUISA CRUSE, Appellant, v. FRANK CRUSE, Appellee.

**HUSBAND AND WIFE:** Separate Maintenance—Grounds. Though a husband is guilty of no personal violence toward his wife, yet she may be entitled to separate maintenance on a showing that his conduct toward her has been domineering, arbitrary, unsympathetic, unkind, stubborn, uncommunicative, and parsimonious, and that such treatment has endangered her life. (See Book of Anno., Vol. 1, Sec. 10481, Anno. 147 *et seq.*)

Headnote 1: 30 C. J. p. 1075.

*Appeal from Cedar District Court.*—JOHN T. MOFFIT, Judge.

APRIL 6, 1926.

ACTION for separate maintenance, based on the ground of cruel and inhuman treatment. The defendant denied the material allegations of plaintiff's petition. Upon the conclusion of all the testimony, the petition was dismissed, and judgment was entered against the defendant for costs. Plaintiff appeals.— *Reversed.*

*Johnson, Donnelly & Lynch,* for appellant.

*C. O. Boling* and *J. C. France,* for appellee.

DE GRAFF, C. J.—An action for separate maintenance must be supported with that quantum of evidence which warrants a decree of divorce. *Shors v. Shors,* 133 Iowa 24; *Shipley v. Shipley,* 187 Iowa 1295. The instant plaintiff alleges cruel and inhuman treatment. Since this appeal presents fact questions only, prior decisions are of little value in solving the problem before us.

Two factors in that problem may be considered. Was the conduct of the defendant cruel and inhuman, within the legal concept of that term? Did the conduct of the defendant endanger the health or life of the plaintiff? The trial court answered in the negative. We answer in the affirmative, and in making that answer we realize that caution should be exercised.

Plaintiff and defendant intermarried in 1882. Plaintiff is nearing her 69th birthday. The defendant husband is 75 years old. Eleven children were born to this marriage, 10 of whom are now living. All the children are married and have homes of their own except the son Elmer. The youngest child is now 25 years of age, and married.

The defendant is financially well situated. He owns 160 acres of land, of the reasonable value of $225 per acre, and is possessed of moneys and credits of the value of about $21,000, the major portion of which is loaned to his sons and sons-in-law at the rate of 5 per cent interest. The home farm is rented to his son Joe at $7.00 per acre, and has been leased by the son for the past 8 or 9 years. This farm contains two sets of buildings, one of which is occupied by plaintiff and defendant, and the other by the lessee, Joe.

The accumulations above mentioned are the result of the combined efforts of plaintiff and defendant. They have been hard-working people, and have recognized the value of thrift.

In the light of the family history and the struggles which these parties have undergone, it is a sad commentary that a court is compelled to write in reviewing the grounds of complaint which impelled the plaintiff to institute the present action. In the study of the matrimonial relations involved herein, should we characterize the conduct, disposition, and

temperament of the defendant by the use of adjectives, it may be said that he has been domineering and arbitrary to a point of tyranny; unsympathetic to a point of cold-bloodedness; unkind to a point of cruelty; stubborn to a point of absolute obstinacy; uncommunicative to a point of perfect silence; parsimonious to a point of niggardliness. Of these matters let the record speak.

For the past 8 or 9 years the plaintiff has been in very poor health, and at times under the care of physicians. She has suffered from a heart trouble technically known as myocarditis. Her nervous system has been unusually sensitive to any excitement or unusual disturbance. The defendant was fully acquainted with her condition and the character of her trouble, and during that time he has never extended to her a word of sympathy, tendered her any personal assistance, or given her kindly or courteous consideration in word or act. The plaintiff was bedfast for four and one-half months in 1924, and her condition was considered quite serious. Her physician testified that "her condition of impaired health and her heart difficulty is a permanent condition." She has also been afflicted for many years with an irreducible umbilical hernia, which causes her a great deal of discomfort and impairs her activity. The physical condition of the plaintiff did not cause any change in the attitude of the defendant toward his wife. For the last 8 or 9 years, the defendant has not talked to his wife. She testified:

"During the last ten or twelve years, he never talked to me —kept silent. Whenever I asked him anything, sometimes he didn't answer at all."

Defendant admits:

"I can't remember any occasion in the last three years that I spoke to her, outside of asking her for a list of groceries. We really have had no conversation, the last three years."

He has been very domineering, and with the process of years this failing has shown no sign of diminution. He thinks his way is the right way, and tolerates no objection. The record is replete with incident. He became quite angry, on one occasion a few years back, when his wife, over his objection,

purchased a piano for the home, and, speaking of the piano salesman, the defendant said:

"He was nothing but a whoreman and anyone who had anything to do with the salesman wasn't any better."

In his testimony he refers to his wife as "the woman."

When he built a new house on one 80 of his quarter section, he did not consult his wife concerning it. She expressed a desire to arrange the house inside, but he refused, saying: "God damn, no two persons can build a house."

Although these parties eat at the same table, no conversation happens between them. The wife testifies:

"In 1917 and 1918, and from that time on, my husband didn't speak to me only just when he had to,—then a few words, and very far apart."

For the past several years, the defendant has refused the wife money when she needed it for her own purposes. He had the piano in the home listed for taxation, by the assessor, in her name, and compelled her to pay the personal property tax. Although both are members of the Catholic church, he has refused her money for contributions to her church, and for many years has refrained from attending services with her.

The defendant was asked, on cross-examination:

"When was the last time you gave her any sum of money for any purpose? A. It must have been 15 or 18 years ago. Q. What money have you actually given your wife in the last 15 years? A. Not any. For 15 years she has paid her church contributions and part of her incidental expenses without any assistance from me."

His generosity is evidenced solely by the permitting of his wife to raise chickens and to sell poultry and eggs, enjoying the benefit of the proceeds thereof. Later, even the number of fowls which she was privileged to have was limited, and he refused to buy the chicken feed, so that she was compelled to sell her only source of revenue.

It is difficult to portray the impressions which a reader of the record receives. It is a composite photograph that is recorded on the mind. Many of the incidents, viewed singly, may be thought inconsequential and trivial; but, when they are

viewed as a part of the whole picture, their significance is then properly measured and understood.

It may not be said that the troubles and difficulties between these parties are traceable to their children. The defendant states:

"My wife and I never talked about any trouble with the children."

The plaintiff testifies:

"The children didn't try to lay any plans. He had his own way about everything. What the children want, I have nothing to do with."

In this connection it may be incidentally said that the children, except one son, who was apparently moved by pecuniary motives, took the mother's part, and defended her both in and out of court.

Apparently the defendant justifies his conduct as to his refusal to give his wife money by his furnishing food and necessaries in the home; that his refusal to talk to her is accounted for by her refusal to talk to him, and that she never apologized to him for any remarks she ever made; that his refusal to consult and act with his wife in the management of the home is based on the fact that it is his home, and that he has a right to do as he pleases, without reference to her wishes. Apparently the conscience of the defendant is clear, since he testified:

"I don't remember of a single word that I have spoken to my wife that causes me to feel any regret."

The cause is not in the words spoken, but in the words unspoken. It was not necessary for him to say anything to indicate how oblivious to him the wife was in his home. A granddaughter, who was assisting in the care of the plaintiff during one of her sicknesses, testified that while the plaintiff was bedfast the defendant did not go to her bedroom or talk to her, and "after she was able to get up and come to the table, my grandfather did not speak to her." The daughter, Mrs. Kline, testified:

"I never saw my father go near her, to manifest any interest in my mother's condition. During the past seven or eight

years of my frequent visits to the home, my father did not treat mother with the least consideration.''

A son-in-law testified that, during one sickness of the plaintiff's, he asked the defendant if he would assist in lifting Mrs. Cruse, to place her in a more comfortable position. He received the answer: ''Not by a damn sight.'' He ordered a neighbor, Mrs. Miles, who came to the home to perform acts of charity and mercy during his wife's sickness, ''not to come any more.'' The defendant testified:

''There is not a single incident in my entire married life that there has been any trouble that I now feel that I have been in any way to blame for.''

This self-serving declaration is valueless, and the record affords him no corroboration to strengthen his belief.

Seven or eight years before this trial, defendant left his wife's bed, and has ever since remained entirely away from her bed and bedroom. He voluntarily chose another room in the home, and has since occupied it alone. The wife now desires to have the *a mensa* joined to the *a thoro*.

His conduct was such as to instill fear in the heart of his wife. That his conduct made his wife nervous and aggravated her condition, there cannot be a question of doubt. His wife's own statement is:

''His treatment during these years affected me—many a night I never slept.''

There is ample corroboration.

We could incumber this opinion with many incidents which disclose the attitude of the defendant toward his wife, which were not provoked by the wife. One daughter testifies that, on one occasion when her mother asked her father, ''What are you looking for?'' he said, ''It's none of your damn business;'' and that ''he started in to abuse her about the children, and charged that she was trying to turn the children against him.'' Another daughter testifies that she heard some things which caused her to know that her parents were having trouble. She heard her mother say: ''If it is a divorce you want, I will not grant it.'' To which the defendant replied: ''I will give you until September to decide.''

During the last sickness of the plaintiff, in 1924, he did not

once enter her bedroom, where she was lying sick, and never inquired how she was feeling or getting along.

The final culmination which led the plaintiff to file the instant suit was the conduct of the defendant on the evening of December 3, 1924. It appears that, during the afternoon of said day, a conversation occurred between the defendant and his son-in-law Grell, who made the suggestion that the defendant might handle his property in such a way as to serve the best interest of all his children, and that the farm that was rented to Joe should be rented "for the high dollar." True to his nature and disposition, the defendant made it plain to Grell that he invited no suggestions. During that evening, and after the son-in-law and his wife had gone home, the defendant told plaintiff that he (defendant) did not seem to be able to please anybody.

"I understand you and the children, and even the grand-children, are not satisfied with the way I am doing. Get you a man and have a settlement."

The wife replied:

"I don't settle that easily or that quick."

His attitude and talk caused his granddaughter, Alice Grell, who lived in the defendant's home, taking care of the house and looking after the interests of the plaintiff, to go to a neighbor's, where the son Elmer was employed, to tell him what she had heard. The son immediately came to the father's home, and, upon his asking the mother what was the trouble, she said: "The same trouble again." Thereupon, Elmer went into the kitchen, and said to his father:

"What do you mean? Mother just got over a hard sick spell. She isn't well, and starting in like this will be the cause of her death some day. I don't think you ought to do things like that."

The defendant, without a moment's hesitation, told the son that, if he wasn't satisfied, he could get through the hole the carpenter left, and "to get out of there." The defendant immediately went to the storeroom and procured a shotgun. Elmer, being told by Alice of this movement, left the house. The defendant loaded the gun at that time, returned to the dining room with the gun, and asked:

"Where is he? Now let him come, if he wants to; I will show him."

A little later, he went out and cut the telephone wires, and at all times that evening carried the loaded gun with him.

Plaintiff had nothing to do with this transaction, but it is obvious that the actions of the defendant on this occasion caused her great worry. There was no occasion for such conduct on the part of the defendant. The son Elmer was fully justified in having his father arrested and taken by the sheriff the same evening to the house of his son Joe, in order that the plaintiff and a daughter, who had come to the house, might not be further disturbed. The plaintiff that evening had observed the defendant secure the gun. She testified:

"When my husband came with the shotgun, I ran out of doors and stayed out of doors quite a while. It was after dark. I was chilled. I stayed in the yard until Mrs. Kline [her daughter] came, and they made me go into the house and go to bed."

The daughter testified that her mother appeared to be very excited and very nervous, and that she was hardly able to walk.

It is true that the evidence in this case does not show that the defendant ever used personal violence toward the plaintiff; but a husband may be guilty of cruel and inhuman treatment, within the meaning of the statute, without personal violence. It is sufficient that the acts charged are shown to endanger her life. *Dabelstein v. Dabelstein,* 191 Iowa 808; *Thompson v. Thompson,* 186 Iowa 1066.

In the *Thompson* case it is said:

"It takes more than the physical body to make up the entity known as a human being. The mind can grasp the possibility of inhuman treatment that does not endanger life. Whether it does or not, depends, not only upon the physical, but upon the moral, mental, or spiritual quality of the one made subject to the treatment."

We will not pursue the inquiry further. Plaintiff told the court:

"I can't stand the continued mode of existence I have been compelled to endure the past seven years."

We are satisfied that the plaintiff is entitled, during the few remaining years of her life, to enjoy a mental peace and the spiritual consolation of her religion. The conduct of the defendant cannot be excused or legally justified. The wife is entitled to be treated differently from a medieval chattel. She has worked and saved along with the defendant during the years. She has been patient. She now elects to have another home, and to be free from the environment which has caused her so much worry and distress. The facts establish her case. The judgment and decree entered must be reversed, and it is ordered that the trial court enter a decree in conformity to the prayer of plaintiff's petition, and that judgment be entered against the defendant in favor of the plaintiff for her support and maintenance in the sum of $100 per month, to commence on the 6th day of April, 1926, said sum to be paid on the 6th day of each month thereafter during the life of the plaintiff, or until the further order of the district court; that said judgment constitute a lien on the real estate of the defendant; and that the costs and the accruing costs be taxed against the defendant.—*Reversed.*

EVANS, ALBERT, and MORLING, JJ., concur.