LYDIA DEPPING, Appellee, v. BENJAMIN DEPPING, Appellant.

MAY 15, 1928.

REHEARING DENIED NOVEMBER 16, 1928.

*E. R. Acres* and *T. H. Goheen,* for appellant.

*William S. Hart,* for appellee.

De Graff, J.—Plaintiff and defendant intermarried October 2, 1919. A child, Adeline, was born the following year. At the time of the trial (1925), the wife was 28 and the husband was 37 years of age. Both parties are of German descent, and have the same religious affiliations. Prior to their marriage, they had kept company for three or four years, and upon their marriage moved on the Depping farm, the homestead of the Depping family, but then owned by Ben Depping, the defendant-husband.

The abstract of record in this case is quite voluminous, comprising more than 200 pages of printed matter. It is replete with incompetent testimony to which we will not refer, as the one and primary fact question is: Does the evidence sustain the charge of the plaintiff that the defendant was guilty of cruel and inhuman treatment toward her, as alleged, and within the meaning of the statute? A careful review of the evidence compels us to answer in the negative. Furthermore, there is no evidence corroborating the testimony of the wife bearing on the alleged cruelty. Separate maintenance may not be granted under the instant plea, unless the evidence would justify a decree of divorce. *Leonard v. Leonard,* 174 Iowa 734; *Naumann v. Naumann,* 182 Iowa 420; *Shipley v. Shipley,* 187 Iowa 1295, 1306; *Cruse v. Cruse,* 201 Iowa 810.

The whole trouble seems to have arisen from the worry incidental to the heavy indebtedness owed by the defendant to divers creditors, including his brothers, and to the fact, which finds some support in the record, that the defendant and certain brothers of the defendant anticipated and expected that the father-in-law of the defendant would finance the defendant. There is little in the conversations respecting the financial end of this case that has any bearing on the allegations upon which separate maintenance is predicated. It may be conceded that the defendant was financially embarrassed, but that does not constitute a ground for separate maintenance. The defendant's father-in-law was a thrifty, well-to-do business man, and it is apparent that he was somewhat disappointed in the defendant's business ventures and the manner of meeting the situation.

No one except the plaintiff-wife offers evidence bearing on the defendant's cruelty toward the wife. The mother-in-law does not so accuse him, and the father-in-law states that he never

heard him speak a cross word to the plaintiff. The parents of the plaintiff lived in the Depping home for a year subsequent to the marriage of plaintiff and defendant, and surely were in position to observe the conduct of the defendant toward his wife.

The wife testified that she was afraid of the husband by reason of his scolding, raving, and talking in a loud voice. There is evidence that the husband vocalized considerably in singing both popular and religious songs during chore time, and also swore considerably at the stock. This was done in such a loud tone of voice that near-by neighbors could hear him. No witness testifies that he ever heard Ben Depping "say anything ugly to his wife,"—in fact there is no evidence of any unpleasantness between the husband and wife, except as testified to by the plaintiff-wife. Undoubtedly, the plaintiff worked hard on the farm. The neighbors testify that Depping was a peaceable fellow, and was considered a good neighbor. One witness stated that, after Mrs. Depping left him, some of the neighbors expressed the opinion that he was a "damn fool for using her that way," which referred to the quantity and character of work the wife did about the farm.

The defendant's father-in-law testified that Ben "was very unruly, and seemed to be entirely dissatisfied, and scolding and growling practically all of the time." This conduct, however, did not have reference to the relations with defendant's wife. The husband was undoubtedly worried over money matters. He was heavily involved, and, according to the father-in-law's testimony, Ben asked for money quite frequently. The father-in-law was not pleased with Ben's conduct and his management of business affairs. The wife had complained to her father about her husband's actions, and testifies that she told her father that she would not stay at the home any longer "if there wasn't a [another] man there all the time."

It also appears that the father-in-law attempted to secure from his son-in-law a statement concerning his business affairs and the amount of money that he was owing, and for this purpose tried to bring together certain brothers of Ben, for the purpose of talking "about this business." Nothing resulted from this suggestion, and no financial help did, in fact, come to Ben. This matter seems to have been the subject of some comment between the father-in-law, son-in-law, and some of the

brothers of Ben, and we may well assume that it was discussed between the plaintiff and her father, and that Ben was disgruntled by reason of the fact that he did not receive the assistance which he expected from the father-in-law.

The plaintiff testified that, about two or three weeks after her marriage, the defendant told her she could go home to her father, and that he didn't care for her any more; but she further stated that she didn't think Ben meant it. "I cared lots for him." The plaintiff also testified that the husband complained that her father did not give him any property or money, and that "I should go where I came from; that I hadn't brought anything there, and he didn't care for me." The wife also complains that, on one occasion, "he took the butcher knife, and said, 'If it goes too far, I will do [indicating] this way,' and done it to himself, and done it to me. He was going to stab me and cut my throat." This circumstance finds no corroboration in the record. The wife also states that he made a threat with a knife at different times, "but not quite as bad as this time." She testifies that this threat was made three or four times by the husband. It was for this reason that she states that she was afraid of him, "afraid he would kill me," and further, that that was the reason why she wanted either her father or mother or one of the brothers on the farm.

It appears that, on the 10th day of April, 1922, the plaintiff left the home of the defendant and went to the home of her father, where she has remained since. In a letter dated February 8, 1923, to her pastor, she stated:

"He [Ben] hasn't made any promises for the better whatever. I thought we were to meet at your house and talk matters together and then you could have heard what he says. I think the most trouble is money matters. He says he is hard up, but as long as he lets his brother have his money and he won't look for the interest of his own family, I don't think he would care for me anyway."

After the plaintiff left the home of her husband, the latter asked her when she was coming back. The husband did ask her several times to come back.

On behalf of the defendant, a brother, Fred H. Depping, testified that he had been at Ben's home on several occasions

after his marriage to plaintiff. No unkind word was ever said to the wife in the brother's presence. He testified that his conduct was what you would expect from a husband toward his wife. This brother denies that he was ever called by phone for the purpose of taking care of Ben at a time when the plaintiff felt that she was in danger. He did respond to a telephone call, but it was in regard to some chores. This brother also testifies that the father-in-law said to him on one occasion that "you [Fred] and your brothers ought to come together and settle things up with Ben,"—to which Fred replied: "Whatever I have to settle with my brother Ben, I can do that between him and me,—don't need anybody else to help me."

Another brother, Reverend August Depping, visited occasionally at the defendant's home, and sometimes stopped a day or two. He testified that the attitude of plaintiff and defendant toward each other was peaceable, and that Ben's conduct toward the wife was kind. He never heard a cross word between them. This brother asked the father-in-law, after the wife had left the defendant, whether Lydia (plaintiff) was "going to come back soon to Ben," to which the reply was made that she would not come back under the present financial circumstances under which Ben then was. In brief, none of the relatives who had occasion to visit Ben Depping's home ever observed any conduct on the part of Ben toward his wife that was subject to criticism.

The defendant himself testifies that, on the occasion of his wife's leaving his home with her father and mother, he was not informed by her at the time that she did not intend to come back, nor was he ever told subsequently by her why she had left.

"I didn't know she was going to leave, and never consented to it. Since she left, April 12, 1922, our relations as husband and wife have ceased. After my wife Lydia left home and went to live in Waukon with her parents, I had a talk with her, and asked her when she would return. That occurred more than once. She didn't say much then; she seemed to depend upon the wishes of her folks."

There is little occasion to enter upon a recital of the denials made by the defendant with respect to the accusations made by the wife against him. Sufficient to state that they are positively and absolutely denied. Upon a review of the entire record, we

fail to discover that plaintiff has sustained her petition, under the statutory rules governing divorce. There was no legal cause which justified plaintiff in leaving her home. It follows, therefore, that her act was one of desertion, within the meaning of the statute. The cross-petition of the defendant should have been sustained, and a decree entered on his cross-petition. Wherefore, the decree entered by the trial court is reversed, and the cause remanded for a decree in conformity to this opinion.—*Reversed.*

FAVILLE, ALBERT, MORLING, and WAGNER, JJ., concur.