DORIS AILEEN ROACH, Appellee, v. PAUL R. ROACH, Appellant.

No. 40899.

JUNE 20, 1931.

REHEARING DENIED OCTOBER 31, 1931.

Warren H. White and E. C. Roach, for appellant.

Fisher & Riter, for appellee.

KINDIG, J.—Doris Aileen Roach, plaintiff and appellee, asks a divorce from her husband, Paul R. Roach, defendant and appellant, on the ground of inhuman treatment. By way of cross petition, appellant demands a divorce from the appellee, his wife, on the same ground. Section 10475 of the 1927 Code, so far as material, provides:

"Divorces from the bonds of matrimony may be decreed against the husband for the following causes: * * *

"5. When he is guilty of such inhuman treatment as to endanger the life of his wife."

Likewise, Section 10476 of that Code contains this provision:

"The husband may obtain a divorce from the wife for like cause, * * *"

The district court found that appellant was not entitled to a divorce, but that appellee should receive such decree. As said in the preliminary statement of facts, in addition to giving the wife the judgment and decree of divorce, the district court also granted her the custody of the minor children, James Robert Roach and Paul Frederick Roach, and gave her certain household fixtures. From that judgment, the appellant appeals.

Underlying his argument here is the thought that appellee failed in her proof. Such failure, appellant contends, embraces three propositions: First, the insufficiency of the evidence to sustain inhuman treatment; second, lack of proof that the treatment endangered her life; and, third, insufficient corroboration of appellee's testimony. Furthermore, appellant maintains that appellee should not have the custody of the minor children, and that the alimony granted her is excessive. On the other hand, appellant insists that he should have a divorce from appellee and be given custody of the two children.

I. Did appellee furnish proof to sustain her charge of inhuman treatment? A careful study of the record indicates that she did.

These parties were married at St. Paul, Minnesota, October

1, 1921. At that time appellant was twenty-seven and appellee only seventeen years of age. She had graduated from the Pine River, Minnesota, High School, spent one year in college, and taught school for nine months. · Appellant is a graduate of Wisconsin University, and, before his marriage, had been a soldier in the World War. Appellee's father and mother, while she was at home lived on a farm, and later moved to Pine River, Minnesota, from which place her father carried on the business of a traveling salesman.

Before appellant joined the army, he worked at Des Moines, Iowa, for a real estate and home building firm. After returning from the army, appellant was again employed by the same firm and went to Pine River, Minnesota, where it had a large tract of land. Soon after appellant arrived at Pine River, the inflated business condition, which followed the war, ceased and immediately business affairs descended into a depression. Consequently, appellant was compelled to leave his employment with the land company and obtain work in a Pine River bank, where, in addition to his banking duties, he wrote life insurance. While in Pine River, appellant met appellee and they were married. Following their marriage, they moved to Rock Rapids, Iowa, where appellant worked in his father's law office and wrote life insurance. Two children were born to them as the fruit of this marriage. They are the above-named James and Paul.

According to the record, appellee is a very refined and gracious lady. Also she is a talented musician. Because of her ability as a musician, her services are demanded in the church choir. Being thus talented and refined, appellee was invited into Rock Rapids society. She is a member of the P. E. O. Sisterhood, the Federated Women's Clubs, and other organizations. For some unexplained reason, appellant objected to her activities in church functions and her attendance at parties and social gatherings. When the young people of the community came to the Roach home, appellant was grouchy, non-communicative, and surly. Frequently appellee would arrange for parties or picnics and then would humiliatingly be compelled to give them up because of appellant's attitude. Neighbors and friends noticed appellant's conduct in this regard, and appellee was very much embarrassed and chagrined. It seems that appellant at all times in the presence of others treated appellee as a child

and insignificant. He said she was rotten and a liar. Upon occasions, appellant threatened to "knock her cold" and "knock her down." At least once, he drew a butcher knife. While contemplating a Thanksgiving dinner, appellant stated he hoped strychnine would be put on the portion served to appellee. During all his married life, appellant cursed and swore at appellee, used such terms as "Jesus Christ", "son of a bitch", "she devil", etc.

Appellee·was terribly lacerated when the first child was born. Dr. Winkler said.:

"This laceration in this particular case was responsible for a great deal of discomfort to Mrs. Roach, I imagine, because not only the perineum or the soft parts were lacerated with healed scar tissue in contact, but the mouth of the womb had also been torn and had a great deal of scar tissue, and this makes a woman more or less uncomfortable. It is something that would reduce her strength. * * * That alone would produce backache and distressing symptoms, nervousness."

Another Doctor, Corcoran, advised appellee that the laceration should be repaired soon after the childbirth. She told appellant, but he did not take her to a physician for several years. Concerning the effect of this laceration, appellee testified:

"I suffered a great deal from this, when I worked all day; rubbing clothes on the wash board was about the hardest. I did the family washing."

Regardless of the laceration, appellant insisted on having sexual intercourse with appellee. Even though she objected, he still made his demands. Because of the laceration, the sexual relationship was especially objectionable to appellee. Her statement of this is here quoted:

"It was almost unbearable sometimes, and distressing. When I refused he became angry. He would curse. He kicked at me once; kicked me out of bed. His attitude was about the same during that period; it continued through our married life. It has increased in bounds in the last few years."

Not only did appellant conduct himself in the manner and way aforesaid, but he constantly complained. He made ob-

jections to the cooking, the housekeeping, etc. Although now appellant admits that appellee is a good cook and a tidy housekeeper. Again appellant frequently objected to appellee's care of the children and interfered with her correction and control of them. At this time, however, appellant thinks that she is a good mother, and can take proper care of the children.

Neighbors came to the Roach house and they heard appellant's complaints. Nothing seemed to please him. On occasions appellee permitted neighbor ladies to care for the children at short intervals while she was at church or at luncheon in another neighbor's home. Appellant complained of this and said that appellee would never see the children again, that she need not return home. Appellee's brother had invited her to visit him in Minneapolis, and she was very anxious to go. Mr. and Mrs. Walerius were driving and appellee wanted to save expenses and ride with them. When Mr. and Mrs. Walerius came to the Roach home in the morning, appellant put his arm around Jimmy (the child above named) and said: "You are not going," but that appellee could go. After the visit, appellee returned and appellant said that he did not expect her back.

Later, appellee again desired to go to St. Paul and traveled as far as Worthington with Jimmy. While she was in the depot waiting for a train, the appellant came in, apparently for the purpose of taking the child back to Rock Rapids. Then, according to appellee, "he (appellant) picked Jimmy up, turned to me (appellee) and said, 'Are you coming?' I said, 'Yes, I am coming.' Well, he said, 'You don't need to; I am going to take Jimmy back. You can take your train; there is nothing holding you.'" This unkind treatment continued. During all the time appellee was troubled with the laceration, appellant insisted constantly on sexual intercourse.

So, in July, 1927, appellee, feeling crushed, humiliated, and sad, went to Litchfield, Minnesota, to visit her aunt and cousins. There she indiscreetly permitted herself to be in the company of Walter Werner, a deputy sheriff. She first met him at a dance, and later, on another occasion, they went to a dinner party. Her cousin introduced appellee to Werner as Miss Kline. "Kline" was her maiden name. Before meeting Werner, she took off her wedding ring. Afterwards, during her stay at Litchfield, ap-

pellee went out riding with Werner in an automobile, and she testified that they were affectionate toward each other. However, appellee said that she had been indiscreet, but had no improper relationships with Werner or any other person. That is admitted by appellant, and, in an amendment to his petition, he states:

"That at no time has he (appellant) ever, or intended to, charge the plaintiff (appellee) with any immoral or lascivious conduct between this plaintiff and the said Walter E. Werner, or with any other man or men; nor has he (appellant) ever at any time, or intended to, accuse the plaintiff (appellee) of being guilty of immoral or lascivious relation or conduct with the said Werner or any other man or men."

Appellee returned home from Litchfield and wrote letters to Werner, to which letters he replied. Appellant obtained possession of the letters, or received copies of them, and appellee admitted her entire relationship with Werner and acknowledged the authorship of the letters. Whereupon, appellant forgave her, condoned her actions, and they again lived together at Rock Rapids as husband and wife until shortly before the present action was commenced. Frank admission was made by appellee of the episode with Werner, and she humbly acknowledged her wrong. By way of explanation, however, she said:

"It seemed to me that I had a thousand reasons (for the indiscretion). In fact, the minute I got on the train to go up there (Litchfield), or to go any place, I just felt as though I had gotten off a terrible load. It just seemed to me I had been so browbeaten and criticized so much and had so little pleasure or sentiment, or even respect in my (married) life, that the first time anybody paid any attention to me I accepted it."

After the reconciliation, nevertheless, appellant at all times continued his cruel treatment of appellee. In 1928, the laceration aforesaid was remedied by a physician in a hospital. The doctor told appellee that she must not again bear children for a considerable time. Yet appellant continued his approaches and complained because appellee would not sleep with him. She occupied a bed with the child, Jimmy, and appellant repeatedly complained about this. He told her to sleep on the floor if she

did not want to occupy the bed "where she belonged." At times appellant unjustly accused appellee of improper relationships with other boys and men, but on the witness stand he expressed the belief that she did not commit any immoral act, and, as shown by the aforesaid amendment to the answer and cross-petition, he at this time does not intend "to accuse the plaintiff (appellee) of being guilty of immoral or lascivious relation or conduct with * * * any man or men."

Throughout the time appellee and appellant were married, he quarreled with her about the most trivial and unimaginable little things. For instance, that a child had taken a nickel out of his bank to put in the Sunday School collection, that a cat was in the house, and that when the children had scarlet fever, appellee called a doctor and a quarantine was put upon the home. Upon other occasions, appellant became more vicious, stood up from the table, drew a carving knife and said: "You (appellee) know I would like to cut your throat." Jimmy, the little son, "screamed and got up from the table to hide." During that time, according to appellee, appellant was "waving it (the knife) around in the air." About midnight on one occasion appellant went to appellee's bedroom, where she was sleeping with the boy Jimmy, and insisted on forcing his attentions upon her. The child was awake and asked his father to desist. Because appellee refused his attentions, appellant became angry and "jumped up and said: 'You are through (living as the wife of appellant). Well, all right, just get right out. Get out of the house and go right away.'" Appellee then dressed and went to a neighbor's home, where she staid a few days.

On another night, appellant insisted that appellee sleep with him. He went down stairs and said: "I will put my life against yours that you don't" sleep with Jimmy. Being frightened, appellee decided not to stay in the house, and dressed, preparatory to leaving for a neighbor's home. She started out the door. Appellant ran after her and said: "By God, I am going to get you this time." Then appellee screamed, and appellant "put one hand over her mouth." They had quite a "tussle." When thus struggling, appellant pushed appellee into the house and locked the door. Neighbors heard her screams and called on the telephone to ascertain the reason. At least one of these neighbors saw appellee on the couch holding her

wrist, while appellant was walking back and forth talking angrily. He went to the telephone to answer the neighbor's call and falsely said that appellee was in bed.

There are many other facts and circumstances that could be related from the record, but we have said enough to indicate the general trend.

Considering appellee's refinement and culture, it is manifest that appellant's treatment of her was inhuman within the statutory provision aforesaid. Coulter v. Coulter, 204 Iowa 575; Thompson v. Thompson, 186 Iowa 1066; Cruse v. Cruse, 201 Iowa 810; Shors v. Shors, 133 Iowa 22; Berry v. Berry, 115 Iowa 543. Then, is it such as to endanger her life? If it is not, no divorce should be granted appellee. Wallace v. Wallace, 212 Iowa 190; Vogt v. Vogt, 208 Iowa 1329; Hill v. Hill, 201 Iowa 864; Perry v. Perry, 199 Iowa 685; Yetley v. Yetley, 196 Iowa 314; Nelson v. Nelson, 208 Iowa 713; Walker v. Walker, 205 Iowa 395.

" 'Life may be endangered by treatment though it involves no physical violence.' " Coulter v. Coulter, (204 Iowa 575), supra.

To the same effect, see other cases first above cited.

Concerning the result of appellant's treatment upon her, appellee testified that it affected her nerves and that she feared for her life. The record indicates the following:

"The court: Well, to what extent has it (appellant's treatment) affected your nerves, as you observe? Anywhere near the breaking point, in your judgment? A. It seems so, sometimes.

"The court: Suppose it would continue indefinitely? A. I think I would lose my mind. I really do.

"The court: Feel as if it had reached that point or close to it? A. I certainly do."

Following the foregoing, appellee further testified that she feared appellant. Her testimony in that regard is as follows: "I am afraid of Paul (appellant). I don't think it is safe (to live with him)." That fear on her part is sustained by the record. Obviously, the trouble between appellant and appellee amounts to something more than mere incompatibility. Thompson v. Thompson (186 Iowa 1066), supra. Appellant inhuman-

ly treated appellee, and such inhuman treatment endangered her life.

But it is contended by appellant that there is not sufficient corroboration for appellee's testimony. Section 10474 of the 1927 Code contains this provision: "No divorce shall be granted on the testimony of the plaintiff alone." In the case at bar, however, appellee's testimony, if not entirely, is largely corroborated by many witnesses. Doctors testified concerning her lacerated condition and the effect it had upon her health, etc. Likewise, those physicians stated she should not become pregnant under the conditions, and advised her to rest and take a vacation. Dr. Winkler stated that in 1928 appellee was nervous and losing weight. Many neighbors told about the appellant's grouchiness and unkindness toward appellee. These friends also explained appellee's humiliation when appellant would not permit her to have parties, picnics, etc. They also informed the court of her screams upon the occasion before explained. So, too, these friends and neighbors related how appellee had come to their homes in tears. Several witnesses testified that appellee was a good housekeeper, and kindly and carefully looked after the children. Also neighbors and friends stated that her reputation for purity and chastity was good. Corroboration also may be found in the testimony of appellant himself. It is true that appellant denies some of the accusations made by appellee, yet there may be found in his testimony corroboration of her claims.

After carefully reading the entire record, we are convinced that the corroboration is sufficient, and the district court properly granted appellee a divorce.

II. Appellant has not made out a case for a divorce from appellee, and the district court's action in denying the same is fully sustained by the record.

III. In the district court's decree, giving the children to appellee, there is the following condition:

"The court * * * orders that said children shall continue to reside in Lyon County, Iowa, until otherwise ordered or permitted by the court, and that both the defendant and the grandparents of said minor children shall be permitted to see and visit said children at reasonable times and places, and permission is hereby given to the plaintiff to permit said children to

visit their grandparents at reasonable times at the grandparents' home.''

Under the record disclosed, there is no reason for changing the district court's order in reference to appellee's custody of the children. She has not forfeited her right to them and it is best for their welfare that they be in her custody.

IV. Complaint is also made by appellant because the trial court gave appellee too much alimony. Objection is especially made to that portion of the judgment and decree providing that appellant pay appellee $75 each month.

According to the evidence, appellee obtains $100 per month from his father and earns at least $25 a month from the insurance business. Considering that out of the $75 appellee must support herself and the two children, each month, it is apparent that the order is not unreasonable. It will be easier for appellant to live on the remainder of his income, than it will be for appellee and the children to survive on the $75 each month.

Wherefore, the judgment and decree of the district court should be, and hereby is, affirmed.—Affirmed.

ALBERT, C. J., and EVANS, STEVENS, MORLING, WAGNER and GRIMM, JJ., concur.