SHIRLEY J. COOPER, appellee, v. ROBERT L. COOPER, appellant.

## No. 48018.

(Reported in 52 N.W.2d 517)

562

April 1, 1952.

Kindig & Beebe, of Sioux City, for appellant.

Clem & Gasser, of Sioux City, for appellee.

Mulroney, J.—Robert L. Cooper appeals from the trial court's decree granting a divorce to his wife, Shirley. He asserts the evidence was insufficient to establish that he was guilty of inhuman treatment, and insufficient to establish that his treatment of his wife endangered her life.

The parties were married in June 1938 and they have three children, whose ages at the time of trial were: Patricia, age twelve, Robert, ten, and Mary Frances, two. Shirley, as a witness, detailed trivial incidents commencing ten or eleven years prior to the divorce action. Robert held a succession of jobs and the family moved around a good deal and they lived part of the time with their parents and relatives. Robert did not make very much money and part of the time he served in the Marines. We will relate one incident which occurred when he was in the Marines and then take up the evidence for the period of about a year before the divorce action was filed.

During the Christmas holidays of 1945 Shirley was staying with Robert's parents in Chicago and sometime after Christmas Robert obtained a leave to come home from the Marine Hospital. They had made arrangements to go to a tavern with Robert's brother and his wife but Shirley testified when Robert arrived home "he had already been drinking", and he did not care to go

out. They finally prevailed upon him to go but he wanted to leave the tavern before the first round of drinks was served. He wanted his wife to come home with him but she refused. She stayed, and she said she told her brother-in-law and his wife: "I would catch it when I got home." As she predicted she did catch it for she said when she got home Robert slapped her on both cheeks with his leather Marine Corps gloves and when she said, "why don't you use your fist?" he accommodated her and used his fist and cut her lip.

The above incident is the only testimony in the record of any physical assault on Shirley. After Robert was discharged from the Marines the parties came to Sioux City where Robert held jobs with the Veterans Administration, Milwaukee Railroad, and Metropolitan Life Insurance Company. About May of 1950 Robert acquired a filling station which he operated until after the divorce action was filed. Shirley's stepfather helped him acquire this station by putting up $1200. While running this filling station Robert also had a part-time job on the railroad. It is Robert's treatment of her during this period while he was running the station and working part time for the railroad that Shirley chiefly complains. She says she called at the station and "didn't always find him there." Her chief complaint is that he did not come home evenings after he was through work. She said he usually got home at 9:15 or 9:30, but about four nights a week he went out with some single men and would not come home until 1:30 or two o'clock. She also complained that he came home intoxicated most of the time—three or four nights a week—and testified to one or two occasions when he stayed out all night. She said he almost never told her in advance that he would not be home and afterwards refused to tell her where he had been. On one occasion he told her if she wanted to locate him to " 'start in the classified section of the taverns and go through from the A's to the Z's.' " On cross-examination she stated:

"I discussed the possibility of divorce with my husband and mentioned it the week end of the 10th of March. At that time he left the house with the two male friends that I objected to his going around with. I have never had occasion to see my husband in the company of another woman. I have been in taverns with

my husband. I drink occasionally. I have been out drinking with him on numerous occasions in the thirteen years. I have been in downtown bars in Sioux City, and I have been with my husband in bars in Chicago. I have been at dances where the people that we were with and ourselves have been drinking. Mr. Cooper belonged to a bowling league, and went one night a week. I did not object to his belonging to the bowling league."

In the testimony of Patricia and a renter in the Cooper home there is a little corroboration for Shirley's testimony that Robert did not always get home directly after he got through work at the station. Patricia said: "Sometimes it was after midnight", and the renter said: "I saw him come home late. It was quite frequent." There is almost no corroboration of Shirley's other complaint as to Robert's excessive drinking. Shirley sought the divorce on the ground of inhuman treatment as to endanger her life and not on the ground of habitual drunkenness. The question then is whether the staying out at night three or four nights a week and the drinking constituted inhuman treatment. We think they did not.

I. Robert is thirty-three years old and his wife is thirty. He testified that one or two nights a week he had to work until 12 or 12:30 at night and it was his general habit to stop at a tavern on the way home for a glass of beer. We are of the opinion that Robert's conduct in failing to come home after work three or four nights a week does not constitute inhuman treatment. Every act of a husband indicating some absence of kindness and tenderness toward his wife is not to be called inhuman treatment. Divorces are not to be granted because of conduct on the part of one spouse that is irritating to the other. The character of the treatment must have some mark of cruelty before it measures up to the definition of inhuman.

II. The same is true with respect to Shirley's complaint of Robert's intoxication. The record indicates her story in this regard might be a little exaggerated as to his intoxication four nights a week. She says her husband prefers beer. And Patricia related only one incident of his being intoxicated in the home. But there is evidence of other witnesses that defendant was often intoxicated. One of plaintiff's witnesses said she had seen defendant "intoxicated, or drinking, quite a few times" but it was

always when he was in the taverns with his wife who was also drinking. This witness said she saw him slumped over the steering wheel of his car, apparently asleep, about seven o'clock one Sunday morning. Shirley said the boy defendant employed at the station told her he found defendant late one night asleep in his car in front of a tavern. But accepting the wife's story as true, the record as to intoxication does not establish inhuman treatment. In Milks v. Milks, 238 Iowa 785, 790, 28 N.W.2d 472, 474, we held: "Mere drunkenness, without more, does not constitute sufficient ground for a divorce under section 598.8, paragraph 5, Code, 1946" (inhuman treatment as to endanger life).

Here there is no evidence of how Robert conducted himself when intoxicated. We do have the testimony of Shirley's stepfather who would not say Robert got "drunk" but he said he had seen Robert "intoxicated" on numerous occasions "several years ago", and he would say "he handled his liquor well." There is no evidence that Robert was mean, morose or difficult to get along with when drinking. Without giving Robert's denial of excessive drinking any consideration, we are of the opinion plaintiff's evidence on this complaint will not justify a divorce on the ground of inhuman treatment.

 III. As to the one incident when Robert inflicted physical punishment on defendant it is argued by defendant that this was condoned. Plaintiff answers by pointing out defendant did not plead condonation. Condonation is an affirmative defense which must be pleaded, but whether pleaded or not the circumstances tending to show an act was condoned may properly be considered as tending to explain how serious the injured spouse considered the act of misconduct. Weatherill v. Weatherill, 238 Iowa 169, 25 N.W.2d 336, and cases cited. This incident took place during a quarrel and under circumstances related by Shirley that do not wholly free her from blame. It occurred a few years before their youngest child was born. The trial court did not mention this incident in his findings. There is nothing in the record which remotely indicates Shirley was fearful of physical violence at the hands of her husband.

 It is our conclusion that plaintiff's evidence fails to show inhuman treatment. This renders unnecessary any consideration of the testimony that the treatment endangered her life, or the

testimony of defendant. Plaintiff says her husband's conduct caused her to have "tension headaches" but there is little or no corroboration for her testimony that it endangers her life. Defendant said his love for his wife and children would never change: "I have always loved them and always will." He told of several attempts to effect a reconciliation with his wife and his wife's refusal to talk with him. He said he would eliminate her complaints and comply with her wishes as to staying home at night and not drinking. He disposed of the filling station after the divorce action was filed.

It is our holding that the decree of the trial court is reversed. And it is our hope that there will be a reconciliation to the end that this marriage, productive of three children whose welfare will be jeopardized if the home is broken, be preserved.—Reversed.

All JUSTICES concur.