Tellie M. Nicolaus, appellee, v. Fred Nicolaus, appellant.

No. 48142.

(Reported in 54 N.W.2d 811)

September 16, 1952.

Carl D. Foster, of Sheffield, for appellant.

Richard C. Leggett, of Fairfield, for appellee.

Wennerstrum, J.—Plaintiff brought an action for divorce from the defendant alleging cruel and inhuman treatment that endangered her life. The defendant in his answer denied this allegation. He also filed a cross-petition in which he sought a

divorce on the same ground. Each party claimed that property in or near Fairfield which consisted of a home, store, filling station and cabins had been purchased with funds furnished by the respective claimants. The title to this property had been taken in the name of the plaintiff. The trial court granted a divorce to her, awarded her the real estate in question and gave the automobile that had been purchased with defendant's funds to him. He has appealed and claims as grounds for reversal that there was insufficient evidence of cruel and inhuman treatment such as to impair the health of plaintiff and endanger her life, that there was insufficient corroborative evidence relative to the alleged acts of cruel and inhuman treatment and that the evidence does not justify the holding by the court that the Fairfield property in controversy was purchased with money belonging to the plaintiff. The defendant does not assign as a ground for reversal the fact that a divorce was not granted him although he had asked for it in his cross-petition.

It can be advisedly stated that the marriage between the parties, as well as the pending divorce action, was the by-product of a Lonely Hearts Club. If the testimony of the defendant is to be believed, the plaintiff must have been lonelier than he, as she wrote to him first and, after correspondence that continued for several months, came to visit him at his farm near Jackson, Wisconsin, staying for about a week.

The plaintiff at the time of the trial in the district court was forty-three years of age. She had been married once before, this marriage lasting approximately seventeen years. She was divorced from her first husband in 1943 in Inez, Kentucky, where they then lived. As the result of this divorce she obtained a three-story building which contained a restaurant, store, living quarters and a beer garden, as well as sixteen acres of land which she stated were sold for $5500. She later obtained other properties in Huntington, West Virginia. These properties had been put in her name by a man she termed her "boy friend." He died approximately a year following this transfer of title. Litigation with his heirs followed, resulting in two trials in which handwriting experts were witnesses. Subsequent appeals resulted.

The defendant at the time of the trial was forty-nine years of age. He owned a farm in Wisconsin until after his marriage

to plaintiff. The initial correspondence between the parties commenced in the fall of 1948 and continued until June 1949 when plaintiff came to visit the defendant. They were married September 25, 1949, in Inez, Kentucky, where her parents resided. It is defendant's claim that shortly after their marriage the plaintiff insisted that he sell the farm. She states that it was not her wish to have the farm sold but that a sale was made of it sometime after the defendant received a letter from a lawyer concerning payments due for support money for children of a prior marriage. However, the plaintiff did testify, "I didn't want to stay in Wisconsin for all my life and eat stale bread and cheese for breakfast. I didn't like the farm." The farm was sold in December 1950 for $20,000 but there were certain obligations of the defendant that were paid out of this amount.

It does not appear necessary to summarize the entire testimony of the respective parties. It seems sufficient to state that there is evidence which is corroborated that the defendant cursed the plaintiff and refused to take her to a hospital in Rochester, Minnesota, when she was sick and said he wouldn't give two cents to save her life. The defendant explains his refusal to make the trip was because of the icy condition of the roads. The plaintiff was taken there by some of her friends. The defendant later went to the hospital and he asserts that he paid the bills attendant to her stay there. This fact is denied by the plaintiff.

In connection with the statements attributed to the defendant, it is of interest to note that one of the witnesses called by the plaintiff to substantiate her own testimony relative to these facts was the woman involved in the picture episode hereinafter mentioned.

Inasmuch as it is the plaintiff's contention that the conduct of the defendant toward her was of such a nature that it affected her health and endangered her life, it is well to note just what her testimony in this respect was. She testified:

"About a year after we got out of (to) the cabin camp we weren't getting along so well. He got so mean I couldn't stand it. I took it as long as I could put up with it. He had gone to Wisconsin and come home with $2300.00 and I didn't know he had it. He hid it in the house and forgot where and accused me of taking it. He found it in a box under the stairs. He said if

1108

he hadn't found it he would have killed me. He threatened to kill me and said I had 3 minutes grace. * * * On one other occasion I found him with Mrs. Horn. I caught him dead and I caught him with Mrs. Horn, also I made pictures. Exhibit P-2 is a picture I took in my home upstairs with a kodak. It was taken a week or two before Christmas last year. The pictures show what I saw with my own eyes. Exhibit P-3 is another picture I took. In my home at the same time. Exhibit P-4 is another picture I took at the same time in the same room. The people shown in the pictures are Fred Nicolaus and Ruthie Horn. It is the same Mrs. Horn that testified before. She lived out there eight or nine months."

On cross-examination she testified relative to these pictures as follows:

"There are three pictures and I took them all. There were other pictures but they weren't any good, they were just shadows. * * * They thought I had passed out, got on a cheap drunk and passed out or so they thought. They were both highly intoxicated. I was pretty good. I was wanting the pictures. I caught them in the grocery store before as I told you. The first picture I took was on the stairs at the top. * * * Q. After the pictures were taken you and your husband continued to live together until July? A. I never lived with my husband since the 8th day of June as his wife. Q. From the 8th day of June? A. From the 8th day of June. He left on the 8th day of July. Q. When were the pictures taken? A. Pictures were taken a week before Christmas. (1950) Q. Then from a week before Christmas until the 8th day of June (1951) you lived with him? A. I did. Q. As husband and wife? A. I did."

On redirect examination the plaintiff testified: "His treatment of me made me sick worrying. I cried and told him he would break up my home. I loved a home. I can't live with this man. He treated me mean, cruel, done me dirty. I stood it as long as I could. I would rather crawl on the floor the rest of my life and scrub than live with him."

The plaintiff seeks to obtain the necessary corroboration to substantiate her testimony by the evidence of two witnesses.

Section 598.7, 1950 Code. The individual involved in the picture incident testified:

"Tellie told Fred he should take her to the hospital and he said he wouldn't, that he wouldn't give 2¢ to save her life. He called her a * * * and told her if she didn't make a will to him for all that property he would kill her or words to that effect. He had a stick that you measure fuel oil with and he acted like he was going to hit her with it but he didn't. The rest of the time they just fussed like any other family would."

Ted Pack, a sixteen-year-old youth, testified relative to certain incidents as follows:

"I heard Fred call Tellie names once. He was in the store and called her a * * *. He also refused to take her to the hospital in Rochester, Minnesota. I was over at the store and heard just the last part of it and I heard him say if it took 2¢ to save her life he wouldn't pay it. That's all I heard. She was awful sick. Her legs was swelled as big as a small plate and she couldn't stand her shoes on her feet. * * * She couldn't eat anything hardly but poached eggs. Heard Fred Nicolaus tell her to drink Lewis Lye water. He said it might help her lose some flesh. * * * I saw him strike at her once in the store with a broomstick. They was fussing about the store and he struck her with the broomstick."

It is well to keep in mind that the plaintiff does not allege adultery and her sole complaint is that the acts of cruel and inhuman treatment consist "in grabbing the plaintiff by the throat and choking her and threatening to kill her and of consorting with women of bad moral character." We have searched the record in vain for any evidence, even by the plaintiff, concerning any choking of her. This leaves as further grounds for consideration the threatening to kill her and the consorting with women of bad moral character.

There is evidence on the part of the plaintiff, as heretofore set forth, that the defendant threatened to kill her. Whether it was the same occasion of which the plaintiff testified is not indicated, but Mrs. Horn did testify to one such incident. There is also evidence of the failure or unwillingness on the part of

the defendant to take the plaintiff to a Rochester, Minnesota, hospital. This fact was also verified by the testimony of Ted Pack who it will be observed stated that the defendant struck the plaintiff. These were the incidents testified to by the plaintiff concerning which there is corroboration. We must then consider whether they were of such a nature that they constituted such cruel and inhuman treatment that they endangered her life.

I. The plaintiff's action is based on the claimed acts of cruel and inhuman treatment which, as pleaded, consisted of choking her, threatening to kill her and consorting with women of bad moral character. As previously suggested there is no evidence of choking in the testimony of the plaintiff or either of her corroborative witnesses. There is evidence of threats made by the defendant to kill her but the evidence is devoid of any showing either by the plaintiff or her witnesses that these statements in any way affected her health. There is also a lack of testimony by the plaintiff or her witnesses that the failure to take her to Rochester affected her health and endangered her life. There is one statement made by Ted Pack that the defendant struck the plaintiff with a stick. But this is not alleged by the plaintiff in her pleading or even commented upon in her testimony. We are unable to hold that the acts here referred to were of such a nature that they constituted cruel and inhuman treatment which endangered her life.

II. The remaining ground of cruelty which plaintiff asserts as a basis for a divorce is that defendant "consorted with women of bad moral character." The plaintiff in support of this claim offered in evidence three pictures which show the defendant and the woman called by the plaintiff as a corroborative witness in a noticeable lack of attire. These pictures were taken by the plaintiff. As shown by the testimony previously set forth, this incident occurred after all the parties had engaged in extensive drinking. As indicative of the whole situation the plaintiff stated her husband and his associate in intimacies were highly intoxicated. Concerning her own condition she testified, "I was pretty good." Evidently she meant she also was somewhat affected by the drinking in which she had engaged. Even though the plaintiff observed the defendant and his associate in a com-

promising situation, she made no disturbance or seemed in any way offended by what she observed. She proceeded to take the pictures which she introduced in evidence in support of her claim of being the victim of cruel and inhuman treatment that affected her life. Yet despite the scene that now is of so much importance in her divorce action, she continued to live with him as his wife from a week before Christmas 1950 until June 8, 1951. We are not impressed with plaintiff's belated claims. In addition to showing that this incident constituted cruel and inhuman treatment she must also show that it endangered her life. Dillavou v. Dillavou, 235 Iowa 634, 17 N.W.2d 393; Milks v. Milks, 238 Iowa 785, 28 N.W.2d 472, and cases cited. Her failure to make it the basis of a divorce action for approximately six months does not indicate that this incident affected her health. We are more disposed to conclude that the taking of the pictures was a part of her plan to obtain a divorce and to again profit by a marriage enterprise. It will be recalled that she testified, "I was wanting the pictures." We fail to find that the plaintiff was in any way injuriously affected by what she observed. There is an entire absence of evidence that by reason of this incident her life was endangered.

III. There are circumstances as noted in Levis v. Levis, 243 Iowa 574, 579, 52 N.W.2d 509, 511, where it was held unfounded charges of infidelity against a sensitive woman may endanger the life of a person so accused and warrant the granting of a divorce on the ground of cruel and inhuman treatment. Without unduly reflecting upon the character of the plaintiff we feel that the evidence presented in this case does not indicate that she was of such a sensitive nature that she was unduly affected by what she had observed.

IV. Condonation is not pleaded by the defendant. However, we are justified in considering the fact that plaintiff continued to live with the defendant for a period of several months following the incident that she now claims constitutes cruel and inhuman treatment as bearing on the extent to which she was so affected. Gemricher v. Gemricher, 230 Iowa 1212, 1214, 300 N.W. 517.

Under all the circumstances shown we are constrained to hold that the plaintiff has failed to show that the acts of which

she complains constitute cruel and inhuman treatment that endangered her life. Consequently we hold the decree heretofore entered by the trial court was in error and that a divorce in favor of the plaintiff is not justified under the record.—Reversed.

All JUSTICES concur.