MABEL MURRAY, appellee, v. CLEVELAND MURRAY, appellant.

No. 48264.

(Reported in 57 N.W.2d 234)

A. V. Hass, of Chariton, for appellant.

Johnston, Shinn & Johnston, of Knoxville, for appellee.

Larson, J.—This is an action for divorce brought by plaintiff, Mabel Murray, based on cruel and inhuman treatment. Defendant filed an answer of denial and asked a fair division of the property if the divorce was granted. On trial, decree was for plaintiff and property settlement of $500 for defendant. Defendant appealed, claiming insufficient evidence to prove the treatment endangered plaintiff's life and health and claiming an inequitable division of property was awarded defendant.

Section 598.8, Code of 1950, provides: "Divorces from the bonds of matrimony may be decreed against the husband for the following causes. * * * 5. When he is guilty of such inhuman treatment as to endanger the life of his wife."

Section 598.14, Code of 1950, provides: "When a divorce is decreed, the court may make such order in relation to the children, property, parties, and the maintenance of the parties as shall be right."

Plaintiff, age fifty-six, and defendant, age sixty-nine, were married in April 1937. Both had been married previously, defendant to plaintiff's sister. No issue by birth or adoption, but a grandson of plaintiff, Billy, fourteen years of age, resided with them until they parted in January 1951. Defendant had been in poor health for the last four years and had done little or no work. Prior to that time defendant was employed in and about Chariton as a brickmason and had spent only week ends at home during the working season of nine or ten months of the year.

At the time of the marriage plaintiff was a tenant farmer with her son and together they owned certain stock and equip-

ment left them when plaintiff's former husband passed away. Later plaintiff and her son purchased a farm for $10,000, paying $1700 down. Subsequently it was sold for $15,500, and plaintiff's son engaged in farming for himself. From plaintiff's share of that farm adventure were funds, which now appear to be in the nine-acre tract in plaintiff's name, near Attica, Iowa, valued at about $6500.

In the two years before defendant ceased to work he had earned some $3383.07 and except for his own expenses away from home had contributed most of it to the family support. A cow given defendant by his son was sold recently for $230 to pay bills. In addition, the receipts from defendant's $1000 fire insurance on furniture had gone into reconstructing the fire destroyed farmhouse on the farm property of plaintiff and her son. Defendant also had aided by his labor in rebuilding the farm home. In addition, defendant claimed to have contributed some money received from the 1948 sale of his property near Chariton, Iowa, toward the purchase of a prior owned Knoxville house placed in plaintiff's name and later traded for the presently owned property.

Plaintiff had worked at a laundry in Knoxville and at homes there to provide the family support after defendant's illness. She also took in roomers and did laundry. Little trouble occurred until defendant's illness and he ceased working. He then became irritable and abusive, charging plaintiff with poor cooking and infidelity. During the past four years of married life the relationship became progressively worse until defendant left in January 1951. No fault is charged to plaintiff.

I. Essentially each divorce case presents a fact question. We must first examine the record for acts which amount to cruelty, and decide whether or not they amount to inhuman treatment, and further whether or not the treatment was such as to endanger the life and health of the complainant.

Proof of physical violence, or batteries, is not necessary to satisfy our law, for it has been said, "the Court is not to wait till the hurt is actually done." Evans v. Evans, 1 Hag. C. R. 35, 40, 4 Eng. Ec. 310, 312. Neither the welfare of society nor the parties' relationship demands that sufferance. We said

early in our court's history, "When it is once ascertained that because of the conduct of the guilty party, the life of the libellant is endangered, the nature of the treatment is inhuman or is legal cruelty." Beebe v. Beebe, 10 Iowa 133, 137.

In this case, we have examined the fifteen years of married life of the parties, for we have said the whole married life must be considered in such cases—not merely separate incidents of misconduct. Meyer v. Meyer, 169 Iowa 204, 151 N.W. 74.

The main cause of the trouble in this relationship, as we read the record, occurred through an unfounded suspicion of defendant, developed during the past four years, that plaintiff had affairs with other men, and, secondly, and perhaps to a lesser degree, the financial distress of the family. At any rate the irritability and violent outbursts of defendant, with no cause or fault of plaintiff, caused both to become extremely nervous and ill. Several incidents are related by plaintiff and her grandson. One related to her cooking when defendant called her names and said it "wasn't fit to feed a dog", and a later one when he would "get up in the night and tramp around with guns at all hours of the night", and threatened to shoot her and himself. Other incidents of like character constituted the life of these ill-adjusted people. While the corroborating witness, Billy, may have aggravated the condition with his mischievous false statements to defendant, the falseness of them should have been easily detected by one with nothing else to do, and he should not have persisted in them. These false beliefs of defendant may raise some suspicion of his mental instability, but no evidence of such instability otherwise appears in the record, with the exception of plaintiff's daughter saying she thought he was losing his mind. However, it does not condone defendant's treatment of his wife and cannot explain away his actions with a .410 gauge shotgun clearly designed to frighten, if not injure, the plaintiff. That he was not in jest is disclosed by the fact that the alarmed grandson of plaintiff removed the firing pin from the gun to protect his grandmother's life. To use his words, "I took it out because I didn't want to take no chances. You never can tell; he might have got up enough nerve to have shot her." The grandson said that he was a little bit

worried about his grandmother. At other times defendant swore at plaintiff and threatened "to shoot her." Also threatened to "get a club and beat" plaintiff and her grandson to death, saying, "I'm going to get a club, God damn you, and beat you to death." All this made plaintiff extremely nervous and she stated that she "became afraid of him." He once choked her and placed his fingers across her throat, then gritted his teeth and walked away. From these and other outbursts of temper and exhibitions of morose attitude toward the plaintiff we find that plaintiff had cause to be apprehensive as to her life or health and is entitled to relief. An aggrieved spouse need not wait until harm has been done. Indeed, in this case that may have been too late. Weatherill v. Weatherill, 238 Iowa 169, 25 N.W.2d 336; Zuerrer v. Zuerrer, 238 Iowa 402, 405, 27 N.W.2d 260; Sackrider v. Sackrider, 60 Iowa 397, 14 N.W. 736; Berry v. Berry, 115 Iowa 543, 88 N.W. 1075; Anderson v. Anderson, 191 Iowa 497, 181 N.W. 241; Luick v. Luick, 132 Iowa 302, 109 N.W. 783; Hill v. Hill, 201 Iowa 864, 208 N.W. 377.

In the early case of Freerking v. Freerking, 19 Iowa 34, this court said: "The statute requires two ingredients in cruel treatment to constitute ground for divorce: 1st. It must be inhuman; 2d. It must endanger life."

In Beebe v. Beebe, supra, at page 135 of 10 Iowa, appears the following:

"In the case of cruelty under our statute, the treatment received is not of itself a cause of divorce, and becomes material only as showing a just foundation for the apprehended danger to life. And this cause of divorce is founded on the well recognized law of nature, that the duty of self-preservation takes precedence, and that the duties of this relation are not required to be performed in a state of personal danger."

This was not a case of plaintiff fading away from the lack of affection or attention. Neglect is not her plea. It was not the chilly atmosphere of the home that worried or distressed her. It was the fear of bodily injury, or death, death by a deadly weapon, death to herself, her grandson, or even the defendant, that made her a nervous wreck. She was worried as to what he

might do in one of his sullen or irrational moods, when kindness or reason seemed a stranger in their relationship.

We find from the record that there was cruel and inhuman treatment of plaintiff by defendant; that there was personal danger to plaintiff; and that the corroboration was sufficient.

II. Defendant also argues that the treatment of plaintiff was not such as to endanger her life and health. It is true that the treatment, to entitle a party to a divorce, must be of that nature. It is prescribed by statute and so held by this court in many cases, but we are satisfied that the evidence here so shows. The constant use of profanity, in the presence of a fourteen-year-old grandson by defendant, the taking of a lot of sleeping pills or poison by defendant, and other heretofore related instances are shown to have affected plaintiff's health and she became a "nervous wreck." While the physical violence was slight to a normal person, the danger of serious consequences would appear great and cause mental suffering as it did here. We have held that there may be treatment that endangers life even if there is no physical violence. Weatherill v. Weatherill, supra; Zuerrer v. Zuerrer, supra.

Plaintiff had not gone to a doctor though she said the doctor told her she "had to quit work and worry all the time." The grandson, who lived with them, saw and heard much of the incidents complained of, and plaintiff's daughter said the plaintiff, as well as defendant, was extremely nervous just before they parted, and she advised at least a temporary separation, based on her observation of their attitudes toward each other and their high state of mental distress.

In cases of this kind, although they are in equity, and triable de novo here, in the presence of serious conflict in testimony we are disposed to give great consideration to the decision of the trial court in determining final disposition of the matter. Dillavou v. Dillavou, 235 Iowa 634, 639, 17 N.W.2d 393; Robbins v. Robbins, 234 Iowa 650, 652, 12 N.W.2d 564, 565; Massie v. Massie, 202 Iowa 1311, 1312, 210 N.W. 431, 432; Closz v. Closz, 184 Iowa 739, 169 N.W. 183.

Such actions of defendant would lead any reasonable person to be apprehensive of danger to her life and health. Van-

duzer v. Vanduzer, 70 Iowa 614, 31 N.W. 956; Weatherill v. Weatherill, supra; Hullingèr v. Hullinger, 133 Iowa 269, 110 N.W. 470; Wheeler v. Wheeler, 53 Iowa 511, 5 N.W. 689, 36 Am. Rep. 240; Douglas v. Douglas, 81 Iowa 258, 47 N.W. 92.

■ ■ III. This is not a situation where two people had by their joint efforts accumulated all the property held in the name of plaintiff. It is true that the interest of plaintiff in the farm purchased by her and her son had increased in value, partly through the replaced farmhouse worth considerably more than the one destroyed by fire, and partly because of the general rise in the value of farm property. Yet the improvements to the farm inured to both plaintiff and her son and no claim was made against the son by defendant when the farm was sold and the joint venture terminated.

There was a dispute as to the ownership of furniture covered in the $1000 policy, funds of which were used in the construction of the new home. Many hands helped erect that home, including defendant, and plaintiff replaced nearly all the furniture from her own funds. She also borrowed $400 to pay for materials used to rebuild. When defendant sold his property in Lucas County there is some evidence tending to show part of these funds was used in the purchase of a residence in Knoxville, placed in plaintiff's name. Plaintiff denied this and claimed defendant used it for doctor bills and living expenses.

When we reach the question of whether an inequitable provision has been made for the divorced husband, his conduct becomes material. (See O'Brien v. O'Brien, 239 Iowa 1181, 1182, 34 N.W.2d 183; Cole v. Cole, 23 Iowa 433.) Is there a fair division of the property? Defendant claims not. But he also states in answer to the question, "Now, you want repayment for supporting your wife, is that it? A. I think I am entitled to something." Certainly, if a man is able he must support his wife and family; he must do so without thought of compensation or repayment for performing this duty. During the past four years most of that support came from savings and plaintiff's labors. From defendant's statement there seems some doubt that he believes he furnished more than ordinary support and effort toward maintaining a home. The frugal efforts and business

judgment of the plaintiff, with the nest egg from her deceased husband, appear to account for the present accumulation in the form of a nine-acre tract of property, with the possible exception of $500, which was credited on the payment of the Knoxville house a few days after defendant sold his Lucas County property. Plaintiff was not at fault and should not be penalized. We find no reason to disturb the judgment of the trial court on the division of property, but we believe it was fair and right. The judgment and decree is therefore affirmed.—Affirmed.

All JUSTICES concur except HAYS, J., who takes no part.