BETTY L. DUWE, appellee, v. MORRIS F. DUWE, appellant.

No. 48795.

(Reported in 72 N.W.2d 501)

October 18, 1955.

Robert E. Coon, of McGregor, for appellant.

Ray C. Honn, of Garnavillo, and Alex Holmes, of Strawberry Point, for appellee.

Smith, J.—Plaintiff is 31 and defendant 39 years old. The parties were married November 1, 1948. Two children, a daughter and son, have been born to them, and plaintiff has one child, a nine-year-old son, by a former marriage. Plaintiff charges cruel and inhuman treatment endangering her life and that defendant has, since marriage, become addicted to habitual drunkenness.

Defendant denies generally; and affirmatively pleads condonation by continued voluntary maintenance of marital relations until about July 8, 1954.

Decree of divorce was entered on the ground of cruel and inhuman treatment and defendant appeals. The decree included adjudication of property and custodial rights, not complained of on the appeal.

Defendant argues: (1) Insufficient proof of the alleged cruel treatment; (2) lack of corroborative evidence; (3) condonation; and (4) erroneous admission of expert opinion testimony, based on hypothetical questions, as to the sufficiency of the claimed cruel treatment to endanger plaintiff's life.

I. The first occasion of inhuman treatment mentioned in the record stands admitted. It occurred the night of November 11, 1950. Plaintiff testifies: "I was sound asleep. * * * My husband came up * * * grabbed me by the hair and yanked me out of my bed and proceeded to beat me. * * * He put his finger in my ear and he hit me and as a result of that I have lost part of my hearing. * * * I put up with that beating, I think, for about three hours."

Her husband finally went to sleep and she picked up her daughter (then less than two years old) and escaped to a house across the street where the town marshal lived.

Defendant was later arrested, jailed, fined and served with notice of a divorce suit. There is ample corroboration by the marshal, sheriff, doctor and plaintiff's father. The doctor says: "She was bleeding from one ear, and her eyes were bruised, she had * * * a swelling on top of her head * * * and she was in shock and pain." Defendant admits his conduct on that occasion but testifies to the condonation which terminated that immediate litigation: "I was sorry, I made apologies, we decided upon a reconciliation. We resumed normal marital relations. * * * My wife forgave me."

Thus ended the first chapter. But that condonation did not entirely release him. "Condonation is a conditional, rather than an absolute, remission of the offense, the implied condition being that the * * * guilty party shall not in the future commit any other matrimonial offense." 17 Am. Jur., Divorce and Separation, sections 197, 213; Robbins v. Robbins, 234 Iowa 650, 655, 12 N.W.2d 564; Zuerrer v. Zuerrer, 238 Iowa 402, 407, 27 N.W.2d 260; Craig v. Craig, 129 Iowa 192, 105 N.W. 446, 2 L. R. A., N. S., 669. The law implies in such case the Biblical admonition: "Behold, thou art made whole; sin no more, lest a worse thing come unto thee."

II. The scars left on the innocent parties in such cases are not the only remaining effects of the condoned offense. Of course the condonation does not excuse or authorize future misconduct. But such future acts not only may create new grounds of divorce, they may also revive the condoned offense and re-establish it as an active ground. The offending party is thus left more susceptible to liability for any future misconduct.

While such future events in order to constitute *new* grounds for divorce must be of such extreme character as to endanger the life of the innocent party, they need not be so in order to nullify the condonation and revive the *original* ground.

It has been pertinently suggested if that were required, the doctrine of revival would not be important, since the party offended against might as well rely alone upon the new grounds. 17 Am. Jur., Divorce and Separation, section 213, page 259, citing Langdon v. Langdon, 25 Vt. 678, 60 Am. Dec. 296.

We have definitely and consistently held subsequent conjugal unkindness may avoid condonation and revive the condoned grounds even though the later conduct be less than extreme cruelty and insufficient of itself to constitute ground of divorce. Hickman v. Hickman, 188 Iowa 697, 699, 176 N.W. 698, 14 A. L. R. 929; Robbins v. Robbins, supra (234 Iowa at page 655); Zuerrer v. Zuerrer, supra (238 Iowa at pages 407, 408). See 27 C. J. S., Divorce, section 62c(2); 17 Am. Jur., Divorce and Separation, section 213, page 259, notes 1 to 3.

█ III. It logically follows the testimony of the subsequent offense in- order to operate as a *revivor* of the original ground that has been condoned need not have the same degree of corroboration as is required for testimony of original grounds.

█ Our corroboration statute, section 598.7, Code of 1954, merely provides: "No divorce shall be granted on the testimony of the plaintiff alone." We have held that where repeated acts of cruelty have been testified to by plaintiff not every incident needs to be corroborated. Lamp v. Lamp, 245 Iowa 52, 59, 60 N.W.2d 844; Littleton v. Littleton, 233 Iowa 1020, 10 N.W.2d 57; Courtney v. Courtney, 214 Iowa 721, 724, 243 N.W. 510. Nor is it necessary that the corroborative evidence be sufficient to sustain a decree. Klepper v. Klepper, 234 Iowa 1138, 1142, 15 N.W.2d 213; Leonard v. Leonard, 174 Iowa 734, 738, 156 N.W. 803; Ernest v. Ernest, 243 Iowa 1249, 1256, 55 N.W.2d 192.

It has been said the main reason for the statutory requirement is to prevent collusion. Davis v. Davis, 228 Iowa 764, 768, 292 N.W. 804; Brannen v. Brannen, 237 Iowa 188, 192, 193, 21 N.W.2d 459; Hopping v. Hopping, 233 Iowa 993, 10 N.W.2d 87, 152 A. L. R. 436. The plaintiff's testimony is not rendered inad-

missible and may be considered when no collusion appears. Lamp v. Lamp, supra.

Defendant in opening brief concedes: "There was no dispute regarding the assault on plaintiff in November 1950. There is no question as to plaintiff's corroboration of this fact—but there was no need, since defendant readily admitted same." He proceeds however to contend strenuously that plaintiff has "failed to corroborate any of the alleged and inhuman treatment such as to endanger her life." Manifestly, in this sentence, he refers to the *subsequent* offenses testified to by plaintiff.

The argument assumes that the innocent condoning party relinquishes a present, clear, provable, right and assumes the usually difficult burden of corroborating the testimony of future misconduct before it can be considered as a revivor of the original ground. Such cannot be the law. Marital misconduct usually occurs in privacy. Witnesses are not present as a rule and corroboration is frequently impossible.

■ IV. Our review of the record will have special reference to its adequacy to revive the November 1950 ground and to erase the defense of condonation that terminated the case at that time.

There is, of course, flat contradiction concerning most of the later transactions, both as to their actual occurrence and as to their seriousness. We need not nor do we try to appraise them as individual grounds of divorce; rather we consider the sufficiency of the record as a whole to sustain the decree.

Some of the conduct complained of might be classed as mere violation of those amenities which should accompany the marital relation—"conjugal unkindness", not usually considered as endangering life, its seriousness depending somewhat on its frequency and persistence.

It is proper to say that in weighing the contradictory testimony involving veracity, we take into account the superior opportunity possessed by the trial judge who heard and saw the witnesses.

According to plaintiff, defendant's "repentance" was shortlived. On or about December 1, 1950, he nailed to the bedroom floor near the bed a night stand on which he kept his ash tray, so plaintiff could not move it to make the bed or keep it under the

window where she thought it "looked good." Defendant admits this conduct and that it was a "kid trick."

Plaintiff testifies that in April 1952 defendant got mad and slapped her son (by her former marriage) and when she interceded slapped her several times. When she picked up a cup and threatened to defend herself he knocked it from her hand and left, did not come back for supper, nor speak to her that night when he came home. She says he struck her over the head with a carton of cigarettes the next day, packed his suitcases, announced he was going to leave and said: "I have half a notion to beat hell out of you."

Later, she says, he came back, kicked in the screen at the back door, and kicked her "on the end of my tail bone. For days I couldn't hardly sit or do any heavy work."

Later that year, according to plaintiff, shortly before Christmas, defendant bent her backward over the kitchen sink and threatened to kill her. When she pleaded for mercy he said, "Why should I have mercy on the likes of you?" She says he had a butcher knife in his hands, called her "all kinds of names" and finally ground a bowl of American fried potatoes in her face. She says she had a black eye on Christmas caused by her husband in an argument over her son.

Plaintiff testifies that her husband came home from the Amvets Club in the spring of 1953, intoxicated, and wakened her by throwing hot rum drink in her face, "burned my eyes and nose."

Plaintiff also testifies to incidents in the fall of 1953 when defendant brought out a gun after he had been squirrel hunting and said "I have had all I can take from you, I have a notion to shoot you." She says that on one occasion he threatened to "shoot the house full of holes." Defendant admits having guns in the house but denies having made any threats to shoot. She asserts and he denies that he ever threatened to do away with himself and the children.

In October 1953 they took their sick daughter to Dubuque for medical examination and diagnosis. The doctor arranged for the child to go to Finley Hospital (in Dubuque) the next morning at 8 o'clock. On defendant's suggestion they decided to go back home to Garnavillo for the night.

She says that on the way home he bought liquor at Guttenberg. She urged him "not to drink too much so we can get down to Finley Hospital in time tomorrow morning * * *. He got mad and started running my family down, saying * * * I was the cause of his downfall * * *. You are going to have to get up awfully early tomorrow morning if you are catching the bus; I am not taking you."

Her Uncle LeRoy Bandow was called over "to help them reach understanding around midnight." Mr. Bandow testifies: "Morris, in my mind, was drinking and the discussion was purely regarding taking Barbara, their daughter, to the hospital at Dubuque; Morris says 'Both of you shut up before I knock the hell out of both of you.' Before I left I promised to take Betty and the child to Dubuque to hospital, which I did, the next morning; Morris had refused to take the child to the hospital."

The uncle also testifies to some trouble the next morning over money: "She went back to the house. * * * When she came to come out the door, he grabbed her at the doorway, her buttons came off her coat, they had quite an argument * * *. Morris followed us to Dubuque in about two hours, and plaintiff and defendant engaged in argument in hospital."

The coat incident is explained by plaintiff. She had asked defendant for money for the trip to the hospital. He wrote a check for $50 and she complained that was not enough to admit the child to the hospital and to cover her own personal expenses while staying down there. She testifies he said, " 'I don't give a damn if you starve to death.' " Finally he tore up the check and she said "I will borrow it from my uncle." When she was leaving "he grabbed my coat and threw me down with such a force that it tore all my buttons off my coat."

The uncle's testimony corroborates plaintiff's to some extent; and defendant as a witness admits purchasing liquor on the return from Dubuque, drinking it later on and that he had hold of plaintiff's coat the next morning when the buttons came off. He admits the controversy about money for the Dubuque trip, but says there was no argument and that he "had been drinking whiskey and was perhaps intoxicated to a certain extent * * *; I wasn't dead drunk or incoherent."

He explains his refusal to take his wife and child back to Dubuque: "I had other plans at this time to go to Des Moines to investigate a job possibility * * *, we were trying to figure out how I could get them down there (to Dubuque) and get to Des Moines—all at the same time." He does not say why that was not considered the day before at Dubuque when arrangements were made to return the next day; nor does he explain his conduct in following them to Dubuque the next morning instead of starting to Des Moines.

We pass over testimony of other incidents not too important standing alone, and come to June 1954 when, according to plaintiff, affairs began to reach a climax. Plaintiff had visited her sister in Nebraska and had written a letter home thanking defendant for a birthday gift and making what turned out to be an unfortunate comment as to gifts from her brother-in-law to her sister. Defendant became angry, called her long-distance and said "I don't give a damn whether I ever see you again." She hung up on him.

She says "I could tell he had been drinking * * * he was using abusive language * * *. And he called back there three times, and finally my brother-in-law took the phone and told him not to call any more."

After she came home defendant accused her of "having associations" with her brother-in-law and told her "The next time that man ever touches you, I am going to knock hell out of both of you." She threatened to go to her parents' home. He said "I don't give a damn where you go, but you are not taking the children." When she started to leave with the baby he grabbed her by the hair and dragged her and the baby back into the house. When she tried to phone he jerked the phone from the wall and she tried to knock him out with the receiver.

After this fight she was at her parents' home ten days. She says her husband "promised to get a job, stop drinking, go to church, have family life" and she went back to him until July 6, 1954.

On July 5 she says he became angry over her prolonged absence on a trivial errand (to get a kitten for the baby). He became moody and the next morning left home until past noon. She judged he had been drinking. Again in the afternoon he was

away for an hour, came home, lay "half-dozing." Plaintiff's own son came in complaining of heat and defendant jumped up and called him "a little son-of-a-bitch" which plaintiff resented: "It made me sick."

She says he grabbed her by the hair and pushed her around and ordered the boy "You get to hell out of there." In the exchange that followed he reminded her: "By your death your property goes to me." In the scuffle a little later he raised his fist and she said "Go ahead and beat me up if it's going to give you any pleasure." She says he replied, "I'm not going to beat you up, I'm going to kill you." Finally, she testifies, "I walked out of the house and went over to the church and prayed. And that is the last time I have seen Morris until today."

She testified further that on all "these occasions" he was under the influence of liquor and was a habitual drunkard "the last six months or so" of their married life.

Defendant's own testimony as to the fight when his wife started to leave with the baby preceding the fight over the telephone admits a scuffle over the baby but denies pushing her into the railing or side of the door. He testifies he and plaintiff had marital relations "up to and including July 6." Plaintiff says she was unwilling but if she refused, defendant "became moody and sulky" and "would get drunk and abusive."

V. "But cohabitation is not necessarily a condonation of cruel treatment, and this is especially so as to the wife. As the weaker vessel, and as the victim * * *, she is often to be deemed as under some degree of duress." Hickman v. Hickman, supra (188 Iowa at page 699); Schneckloth v. Schneckloth, 209 Iowa 496, 501, 228 N.W. 290.; 17 Am. Jur., Divorce and Separation, section 210; 27 C. J. S., Divorce, section 61(a); Massie v. Massie, 202 Iowa 1311, 1317, 210 N.W. 431.

VI. Defendant complains of erroneous admission of expert opinion testimony bearing on the sufficiency of the claimed inhuman treatment to endanger life. There is of course no way to know to what extent the trial court considered it. Suffice it to say we have reached our conclusion without giving it any consideration. We know of no reason, however, why such testimony might not be resorted to in a proper case. We disregard it here

because of some doubt regarding the accuracy of the hypothetical question.

VII.  It is true the mistreatment here was endured a long time before the suit was brought.  But we are not prepared to fix the exact time limit of such endurance.  Continuance of cohabitation during a series of wrongs consisting of cruelty in the hope of better treatment should not be treated as condonation.  "Hope springs eternal in the human breast" and reluctance to seek legal relief should be commended rather than penalized.  See 27 C. J. S., Divorce, section 61(a), page 614, note 39; 17 Am. Jur., Divorce and Separation, section 210, page 257, notes 3, 4.

There is much more we might say but this opinion is already too long.  Judicial ability to condense is altogether too rare.

The decree is affirmed.—Affirmed.

All JUSTICES concur.