MILDRED B. PAYTON, appellee, v. GEORGE C. PAYTON, appellant.

No. 50205.

(Reported in 108 N.W.2d 358)

April 4, 1961.

William W. Crissman and A. T. Gravelie, both of Cedar Rapids, for appellant.

Keith E. Stapleton, of Cedar Rapids, for appellee.

Thornton, J.—This divorce case presents the question of how many arguments, discussions or tirades on one subject, coupled with threats to commit suicide with apparent means to carry out such threats, does it take to constitute inhuman treatment as to endanger life within the meaning of section 598.8(5), Code of Iowa, 1958.

The trial court granted a divorce. We agree.

The defendant appeals contending the court erred in granting the divorce, he does not appeal from the order as to support or division of property. He contends plaintiff's evidence does not amount to inhuman treatment as to endanger life, that she has not proved such by a preponderance of the evidence, that the

corroboration is insufficient as a matter of law, and the plaintiff has condoned the conduct of defendant complained of, and, though not pleaded, we should consider the same on the question of her attitude toward such conduct at the time.

Plaintiff, Mildred B. Payton, and defendant, George C. Payton, were married in 1941. At the time of this marriage plaintiff had a daughter, Jo Ann, then five years old. This daughter used defendant's name and was known as Jo Ann Payton. She was not adopted by defendant. The parties lived on a farm near Perry, Iowa, until 1948. They then moved to Perry and lived there until June of 1955. At that time they moved to Cedar Rapids, their residence at the time of trial. Defendant was a farmer, operator of a gravel pit, and truck driver. Shortly before moving to Cedar Rapids defendant started driving trucks, large transports, and was so employed during the time pertinent here. Plaintiff was not employed extensively outside of the home prior to moving to Cedar Rapids. Shortly after moving to Cedar Rapids she obtained employment in a department store and was employed there as a buyer at the time of trial. Two daughters were born to the parties, Dee Ann, fourteen years old, and Sue Ann, seven years old. Jo Ann, the older girl, lived with the parties through high school and at least part of the time thereafter until her marriage in July of 1958.

This action was commenced December 3, 1958, and the trial completed in June 1959. Plaintiff's evidence is the defendant made repeated threats to take his own life. The first threat was made while they were still living in Perry. She says he made a statement to the effect he would see to it he did not return from the trip he was going on as a truck driver.

Plaintiff describes one incident occurring at night about three years ago (evidently three years before the time of trial), when they were discussing the religious belief of Jo Ann's husband, of which defendant apparently did not approve. Defendant got out of bed, went to the davenport, started crying, took a shotgun from a closet, and started to the basement where he kept the shells. Plaintiff got out of bed, went downstairs and talked defendant into going back to bed. Plaintiff relates another such incident, as occurring about two years ago, where-

in he told her to get out of the way before she got hurt. She says she was afraid for the whole family from that time on. Plaintiff's testimony is not quite clear, but apparently on this occasion plaintiff did not immediately get up and follow him and it was necessary for him to pound on the rafters before she came down. In addition plaintiff states the same thing happened numerous times. Just how many the record does not show.

While the parties and the two minor daughters were in New York City after attending Jo Ann's wedding the plaintiff missed defendant in bed and found him sitting on a radiator in the children's room with his head and shoulders hanging out of the window. She touched him and asked him what he was doing and he answered, " 'I am going to end it all, nobody wants me.' " Plaintiff talked him into returning to bed. This occurred July 19, 1958, after the parties had retired. On cross-examination relative to this incident plaintiff testified they did have marital relations on returning to bed and that was the thing that subsided him most.

Also on cross-examination plaintiff testified of four or five occurrences with the shotgun within a week, one before his parents' 50th wedding anniversary when it was 3 a.m. before she got him subsided. This was in 1958.

The shotgun incidents were preceded by long arguments or discussions concerning the religious belief of Jo Ann's husband or Jo Ann's conduct of which defendant did not approve. Plaintiff testifies there were weeks when she would not have more than three or four hours sleep a night, the disturbance would go on into the night, night after night.

Plaintiff testified she has been living under severe nervous tension due to defendant's conduct. She has lost weight, from 130 pounds to 105 in the past three years. Her weight had increased to 110 pounds at the time of trial. She has had psoriasis for seven years and is treating with a Chicago skin specialist. On one occasion she called a medical doctor in Cedar Rapids for nerve pills.

I. Plaintiff's case is corroborated as to the shotgun incidents by her mother's testimony concerning a conversation between her mother and defendant, and by the testimony of

the 14-year-old daughter taken in chambers. She says before they separated he made these scenes practically every night he was in from his run. Likewise defendant's own testimony corroborates plaintiff's testimony. He admits of two or three shotgun incidents in the basement of the home; explains his statement about hurting her, that he was afraid either the butt or barrel of the gun might hit her as they scuffled. He does not deny other incidents or say the two or three incidents he testified to were the only incidents. He did not testify concerning the incident in the New York hotel or the rafter pounding. He states he did discuss the religious problem, that was a small amount of their arguments, but they spent untold hours talking about Jo Ann and things she did. He states he is still upset by the things she did.

From the foregoing it is clear the suicide attempts and prolonged arguments far into the night relative to Jo Ann are proved by a preponderance of the evidence and corroborated as required in section 598.7.

■ One of the reasons corroboration is required is to prevent collusion between the parties, it is not necessary that every detail of plaintiff's testimony be corroborated or that such alone sustain the decree. And defendant's testimony may corroborate plaintiff's. Bouska v. Bouska, 249 Iowa 281, 284, 86 N.W.2d 884, 886, and citations; and Brannen v. Brannen, 237 Iowa 188, 191, 192, 21 N.W.2d 459, 461, and citations.

■ II. The defendant was unemployed from December 1957 to April 1958. In April 1958 he was injured in a motor-vehicle collision and was unable to return to work until December 1958. His evidence was he was unable to get relief and was in constant pain from April to December. He gives as a reason for his attempts at suicide that he was unable to work and did not wish to be a burden. Counsel for defendant did not in the trial court and do not here urge the defendant was mentally ill or incompetent. The trial court on its own motion inquired of plaintiff's mother and defendant's brother if in their opinion defendant was mentally ill and each answered he was not. A divorce could not be granted for inhuman treatment where it appears such was the result of mental illness. The treatment must be the willful act of the guilty party. Bouska v. Bouska,

249 Iowa 281, 286, 86 N.W.2d 884, 887, and citations. There is nothing in this record to show acts of the defendant were other than willful.

III. The real problem is, is the conduct of defendant such as to endanger the life of plaintiff. There is no medical testimony. The only testimony is that of plaintiff, her mother, and the 14-year-old daughter. Plaintiff testified as above indicated to loss of sleep, loss of weight and being nervous, and that she was at the point of no return when she started this action. The mother corroborates the loss of weight and the daughter's testimony corroborates plaintiff's upset condition. Defendant knew of plaintiff's psoriasis, that she had it since 1953, and during that time had a nervous temperament. His idea is this was caused by the untold trouble caused by Jo Ann. The trial court had the opportunity to observe plaintiff and in ruling stated she was "an attractive woman of frail stature and apparently of decent sensitivities."

To entitle a party to a divorce under section 598.8(5) it is necessary both elements appear, inhuman treatment and it must endanger life. Phillips v. Phillips, 251 Iowa 1310, 104 N.W.2d 832. Physical violence is not always necessary. Alberhasky v. Alberhasky, 250 Iowa 986, 992, 97 N.W.2d 914, 918, and citations; and Brown v. Brown, 248 Iowa 802, 808, 82 N.W.2d 661, 664, and citations. The danger to life is sufficient where the danger is reasonably to be apprehended. Phillips v. Phillips, supra; and Weatherill v. Weatherill, 238 Iowa 169, 25 N.W.2d 336.

In Renze v. Renze, 247 Iowa 25, 30, 72 N.W.2d 490, 493, we said: "* * * There must be something 'cruel and inhuman', something needless and beyond the ordinary arguments and quarrels of married life, something which the ordinary experience of men or some substantial evidence tells us will endanger life, before a divorce may be granted under the statute."

If there were nothing more to this case than the arguments and discussions the evidence would be insufficient. Renze v. Renze, supra. However, we have the additional factor of the threats or attempts to commit suicide. We have not heretofore passed on such attempts or threats except where such were coupled with a threat to shoot the other spouse. Brown v.

Brown, 248 Iowa 802, 808, 82 N.W.2d 661, 664; Duwe v. Duwe, 246 Iowa 1336, 1341, 72 N.W.2d 501, 505; and Murray v. Murray, 244 Iowa 548, 551, 57 N.W.2d 234. We have found an expression of views relative to single attempts at suicide in Liedorff v. Liedorff (Ohio Com.Pl.), 113 N.E.2d 127; and Dodge v. Dodge, 103 N. J. Eq. 45, 142 A. 178.

In the Ohio case the court held the attempt to commit suicide coupled by prior and subsequent statements of a desire to commit suicide or to be dead, known to the other party, constituted extreme cruelty, if the party making such attempts was otherwise mentally competent and rational. And that whether the attempt and accompanying statements were bona fide or merely made to aggravate the other, the ultimate effect would be the same and constitute extreme cruelty.

In the New Jersey case the court said at page 46 of 103 N. J. Eq.: "* * * In the first place, there is no evidence of the fact that his wounding by a bullet from a revolver in his bedroom when he was there alone was deliberate. He insists it was accidental. Secondly, I am not prepared to say as a general proposition that an attempt at suicide on the part of a husband is extreme cruelty. In certain cases I have no doubt it would cause a devoted wife much mental anguish and perhaps a personal fear for her own safety. In other cases I can conceive that the wife might view such an attempt with equanimity, and, if the result were successful, even with satisfaction."

From the New York and rafter pounding incidents, we are convinced the attempts or threats were not bona fide. But we are not convinced plaintiff was in a position to so view them. The evidence shows she was greatly concerned and dissuaded him. We are convinced the attempts were deliberately made, the effect upon the plaintiff was serious, and, if continued, would impair her health and ultimately endanger her life. Such threats and attempts coupled with the arguments relating to plaintiff's older daughter as shown in this record fall within the class of things which the ordinary experience of men tells us will endanger life. It is hard to visualize a wife and mother, with two daughters seven and fourteen years of age in the home, so hardened as to view such repeated threats with equanimity. Being put repeatedly through the fear that on this

occasion he may actually carry out his threat, with the consequent effect on the children, is a form of mental torture that plaintiff is not required to longer endure.

IV. Defendant contends plaintiff has condoned the misconduct of defendant. He has not pleaded condonation, but asks the circumstances be considered as showing plaintiff's attitude toward such misconduct at the time. He invites our attention to Gemricher v. Gemricher, 230 Iowa 1212, 300 N.W. 517; Nicolaus v. Nicolaus, 243 Iowa 1105, 54 N.W.2d 811; and Cooper v. Cooper, 243 Iowa 561, 52 N.W.2d 517. In each of these cases a divorce was denied. However, those cases are not in point factually. They do not reach the misconduct we have here. Defendant urges because the plaintiff continued to live with him as husband and wife she has condoned the acts of which she complains, that her prior conduct is inconsistent with the position she now takes. Under this record that does not follow. The plaintiff is not required to immediately seek legal relief for fear of losing her cause of action upon the first or any particular subsequent act of misconduct of the type shown here. Bouska v. Bouska, 249 Iowa 281, 285, 86 N.W.2d 884, 886. Continued cohabitation is not necessarily a condonation of inhuman treatment. Duwe v. Duwe, 246 Iowa 1336, 72 N.W.2d 501.—Affirmed.

All JUSTICES concur except BLISS and THOMPSON, JJ., who take no part.