HELEN W. PEITERSEN, appellee, v. EARL M. PEITERSEN, appellant.

No. 50574.

April 3, 1962.

Fitzgibbons & Fitzgibbons, of Estherville, for appellant.

Winkel & Winkel, of Algona, for appellee.

GARFIELD, C. J.—This appeal presents the familiar question whether there is sufficient evidence, as the trial court held, that defendant-husband "is guilty of such inhuman treatment as to endanger the life of his wife", within the meaning of section 598.8(5), Code, 1958, as to constitute ground for divorce. Fortunately there are no children of the marriage to suffer the usual consequences of a broken home. Nor is any question of alimony or support involved.

Although our review of the evidence is de novo we give weight to the trial court's decision, especially in the matter of credibility of witnesses. Rasmussen v. Rasmussen, 252 Iowa 414, 107 N.W.2d 114, 117, and citations. See also Baker v. Baker, 252 Iowa 1161, 1163, 110 N.W.2d 236, 237. When this is done, we are inclined to affirm plaintiff's right to a divorce.

We have repeatedly pointed out two facts must be proven to constitute the ground for divorce now—and usually—asserted: (1) inhuman treatment (2) such as to endanger the life of complainant. Jewett v. Jewett, 252 Iowa 883, 886, 109

N.W.2d 36, 37, 38, and citations; Lane v. Lane, 253 Iowa 92, 95, 111 N.W.2d 286, 288, and citation. The emphasis in defendant-appellant's argument is upon the contention it is not shown his treatment of plaintiff endangered her life.

We have frequently held life may be endangered by impairment of health. Also that inhuman treatment such as to be ground for divorce may be committed without physical violence. Rasmussen v. Rasmussen, supra, and citation at page 420 of 252 Iowa, page 118 of 107 N.W.2d; Payton v. Payton, 252 Iowa 772, 777, 108 N.W.2d 358, 361, and citations. However, there is evidence here of physical violence.

A threat of bodily harm, if danger therefrom is to be reasonably apprehended, which has the effect of impairing health, may amount to inhuman treatment in the sense here used. Lane v. Lane, supra, and citations, at page 95 of 253 Iowa, page 288 of 111 N.W.2d.

Plaintiff and defendant were married December 18, 1955, and lived with plaintiff's parents, Mr. and Mrs. Fuhr, in the small town of Fenton until about January 1, 1961, when defendant went to live with his mother in a nearby town. Plaintiff is a practical nurse who has worked eight years, eight hours a night, in a hospital in Algona, about 18 miles from Fenton. Defendant is a navy veteran of World War II with twenty per cent physical disability. His previous marriage in 1950 ended in divorce granted the wife in 1953. To earn their board and room plaintiff and defendant worked each evening in the Fuhrs' cafe-tavern in Fenton. Defendant had a watch repair shop in the Fuhr home and a rural Sunday paper route. He also helped part time in a funeral home.

Domestic trouble commenced one to two years before the trial in April 1961, with arguments, some well heated, mostly about plaintiff's relatives. On a Sunday evening in December 1960 her mother told them to stop arguing or leave the house because she could not stand it. They then rode to the rear of the tavern to continue the argument. Defendant told plaintiff she talked too loud and if she did not stop yelling he would kill her. He grabbed her throat and choked her violently, leaving discolored marks on her throat for a week or ten days. Plaintiff managed to open the automobile door and run from defendant.

However, defendant caught her and told her if she told anyone about the incident he would kill them both. He held a pocket-knife to his wrists and threatened to slash them.

Both Mr. and Mrs. Fuhr testify they saw the marks on their daughter's throat but did not ask her about them. Defendant does not deny choking plaintiff on this occasion, threatening to kill her and himself if she told anyone he tried to kill her, or holding his knife to his wrists. He admits he may have tried to choke her.

Plaintiff testifies they quarreled violently on two later occasions. Once defendant came to the tavern, tore down the permits, which bore his name, and asked her for her wedding rings. However he returned the rings later that evening. She says defendant was loud and noisy, threatened to do all kinds of things, took a razor blade from a drawer and said he was going to kill himself. Patrons were in the tavern at the time.

The final quarrel occurred two weeks before the trial when defendant tried to get hold of plaintiff in the tavern, she ran out the back door, he followed, caught her arm, swung her around and she fell over a box. When she returned to the tavern he grabbed her apron and tore it. Plaintiff admits she was not physically hurt on this occasion. Mr. Fuhr corroborates part of this incident. Defendant's version of it does not greatly differ. He says he was emotionally upset at the time.

At another time, apparently before the choking affair, defendant pushed plaintiff into the kitchen sink at the Fuhr home and hit her in the ribs with his fist. Plaintiff's father says he saw this pushing and heard defendant calling plaintiff all kinds of names.

There is undenied evidence defendant threatened on several occasions to kill plaintiff and himself if she went through with the divorce. There is also persuasive testimony defendant accused plaintiff of infidelity without sufficient grounds shown in the record. He admits he called her a whore once in the fall of 1960. Also that at the time of their final quarrel he told plaintiff he had affidavits from five people stating she had been "out with other men." He also admits he does not have the affidavits.

There is much evidence of frequent arguments, many of them heated. They argued about plaintiff's working in the tavern and "any little thing that went wrong." Defendant says the arguments upset them both.

Plaintiff testifies she believes it would be detrimental, injurious to her life and health to continue living with defendant, the choking incident affected her nerves in that she could not sleep and the language he used toward her also affected her nerves. Plaintiff's father expresses the same opinion as to the effect of defendant's language on her nerves. Plaintiff did not seek medical aid.

There is other evidence of course. But we have set out enough, perhaps more than necessary, to indicate the familiar pattern of the controversy. It may be conceded that if it were not for defendant's attempt to kill plaintiff by choking, the showing defendant's treatment endangered plaintiff's life would not be strong. It is true no one testified plaintiff's life was endangered by the choking. But anyone should know, without evidence to that effect, violent choking which leaves discolored marks on the throat for a week or ten days is reasonably calculated to endanger life. Nor are we persuaded danger was not reasonably to be apprehended from defendant's threats to kill plaintiff and himself.

Although it comes too late to help save this marriage, we may observe—as both plaintiff and defendant apparently now appreciate—it was a mistake for them to make their home permanently with plaintiff's parents and for plaintiff, in addition to her nursing, to work in the tavern where most of the patrons are men.

Of course there is some difference in the evidence in all divorce cases. Partly on this account, precedents are of limited value. See Levis v. Levis, 243 Iowa 574, 579, 52 N.W.2d 509, 511, and citations; Baker v. Baker, supra, 252 Iowa 1161, 1163, 110 N.W.2d 236, 237, and citation. However, these decisions uphold a wife's right to divorce on evidence somewhat similar to, or no stronger than, the proof here: Payton v. Payton, supra, 252 Iowa 772, 108 N.W.2d 358; Brown v. Brown, 248 Iowa 802, 82 N.W.2d 661; Murray v. Murray, 244 Iowa 548, 57 N.W.2d 234; Ernest v. Ernest, 243 Iowa 1249, 55 N.W.2d 192;

Levis v. Levis, supra; Worthington v. Worthington, 238 Iowa 1044, 29 N.W.2d 186; Dillavou v. Dillavou, 235 Iowa 634, 17 N.W.2d 393.—Affirmed.

All Justices concur.